**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDWARD LENTZ,** | ) | **CASE NO.  1:04CV0669** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Judge John M. Manos** |
| | ) | |
| **CITY OF CLEVELAND, et. al.** | ) | |
| | ) | |
| **Defendants.** | ) | <u>**MEMORANDUM OF OPINION**</u> |

On March 22, 2004, Edward Lentz, Plaintiff, filed the above-captioned case in the Cuyahoga County Court of Common Pleas alleging discrimination, retaliation, §1983, unlawful disclosure, invasion of privacy, malicious prosecution, and abuse of process claims.  On April 8, 2004, the City of Cleveland, Public Safety Director Sanford Watson, and Chief of Police Edward Lohn (collectively "Defendants"), invoked this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and removed this action to federal court pursuant to 28 U.S.C. § 1441.

On September 16, 2004, Defendants filed a Motion for Summary Judgment.  (Docket No. 23.)  All issues have been fully briefed and are ripe for adjudication.  For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED**, in part, and **DENIED**, in part.  The Court defers a ruling on the invasion of privacy claim until it rules on the pending motion to compel.

# I.    FACTUAL BACKGROUND

## A.    The Shooting, Subsequent Investigation, and Judicial Proceedings

Edward Lentz, Plaintiff, is a police officer for the City of Cleveland ("Cleveland").  On December 06, 2001, he was guarding the home of then-Mayor-elect Jane Campbell.  At approximately 8:30 a.m., a blue station wagon sped down the street and came to a screeching halt.  As Lentz approached the vehicle, it backed away.  He ordered the driver to stop, but the vehicle backed up, hit a tree, and drove towards him.

At some point, Lentz ended up on the roof of the vehicle.  There are varying accounts as to how this happened.[1]  According to Lentz:

> [B]efore the car took off directly at me at a high rate of speed, I attempted to get out of the way, as the vehicle struck me.  It threw me up over the hood, and my weapon came out of my hand, landing on top of the roof of the car.  I continued tumbling over the windshield and towards the driver's side of the vehicle, at which time my left arm got hung up on the luggage rack located on the rear roof of the vehicle.

(Plaintiff's Ex. 2, at 2.)  However, three eyewitnesses dispute this account.  According to them, he was not struck by the vehicle, but rather grabbed onto it on his own free will.  (Defendants' Ex. A, at 9-10, 17 & 30.)

While Lentz was on the roof, the vehicle sped away in a "zig-zagging" fashion towards a busy intersection.  After securing his weapon, Lentz shot fourteen rounds into the roof of the vehicle.  As he indicated, "In fear of my life, as well as the numerous people and school children on the street, I put myself in the best position possible to fire down into the car, and not hit the passenger."  (Plaintiff's Ex. 2, at 2.)

---

[1]    There are also varying accounts as to when Lentz drew his service weapon, whether his service weapon malfunctioned, and how fast the blue station wagon was speeding.  (Defendants' Ex. A, at 42-47.)

The vehicle continued through the intersection and crashed into a yard.  Lentz immediately commanded both occupants out of the vehicle and onto the ground.  He asked if either occupant was hit.  The driver had been struck.  He then called for backup, requested an ambulance, and began administering first aid.

It was later determined that the driver of the vehicle was Lorenzo Locklear, a 12 year-old African American male.  He had stolen the vehicle and had illegal drugs in his possession.  His wounds were nonfatal.  The passenger, Dontez Torres, a 14 year-old African American male, was not harmed.

Immediately following the incident and pursuant to departmental policy, Lentz was given an automatic three-day administrative leave.  Thereafter, and also pursuant to departmental policy, he was assigned to police gymnasium duty pending an investigation.[2]  (Plaintiff's Ex. 11.)     On February 6, 2002, the Use-of-Deadly-Force ("UDF") investigation team completed its investigation and sent its report to First Assistant Prosecutor Edward Buelow.  On March 11, 2002, Mr. Buelow submitted the case to the grand jury.  (Plaintiff's Ex. 23.)  However, in April of 2002, Lt. Robert Klimak of Internal Affairs requested the file back to re-interview witnesses and canvass the neighborhood.  (Buelow Depo., at 42-44; Klimak Depo., at 160-64.)  In October of 2002, the report was re-submitted to Chief Prosecutor Sanford Watson.  (Watson Depo., at 38; Defendants' Ex. A-1.)

---

[2]     According to Cleveland Police policy, "Cleveland Police Officers are authorized to employ deadly force only to protect themselves and/or others from an actual or clearly apparent threat of death or serious physical harm and only when there is no other reasonable alternative."  (Plaintiff's Ex. 1, at 1.)

On February 5, 2003, Lentz was charged with felonious assault and a misdemeanor charge for providing false information to the UDF investigation team.  On April 2, 2003, the grand jury returned an indictment on the misdemeanor falsification charge, but not on the felonious assault charge.  On July 27, 2003, after the state presented its case, the Cuyahoga Court of Common Pleas judge dismissed the misdemeanor charge on a Rule 29 motion.  The judge reasoned that the state's witnesses either had an obstructed view of the incident rendering their testimony unreliable; or that their testimony tended to support the notion that the vehicle struck Lentz.  (Plaintiff's Ex. 46, at 284-86.)

On August 29, 2003, the Police Department filed departmental charges against Lentz for (1) violating the "use of force" policy, (2) alleging untruthful accounts of the shooting incident, and (3) "failing to notify" dispatch before he approached the vehicle.[3]  On September 4, 2003, Lentz entered a plea of no contest to the "failure to notify" charge and the Police Department dismissed the other charges.  (Defendants' Ex. GG-1, at 6.)  On September 8, 2004, he received a 3-day administrative leave.  (Defendants' Ex. GG-2, at 4-5.)  On September 17, 2003, he was reinstated and received back pay.  Id.; (Plaintiff's Ex. 52.)  In sum, he spent 652 days on gymnasium duty.

**B.    Release of Confidential Information, Grievance Charge, and EEOC Charge**

On December 7, 2001, Michael Tobin, from the Cleveland Plain Dealer, and Lisa Lowry,

---

[3]     According to Cleveland Police policy, "Under no circumstances shall an officer assigned to an Special Response Car stop a vehicle without first notifying the dispatcher as to the location and the license number of the vehicle, nor shall an officer leave the police vehicle to check persons or suspicious circumstances without first giving the dispatcher his/her location and the reason for the stop." (Defendants' Ex. E-1, at 3.)

-4-

from WKYC-TV, submitted public records requests regarding the shooting incident.  (Plaintiff's Exs. 8 & 10.)  Pursuant to these requests, the Police Department released Lentz' personnel file.

On December 21, 2001, Lentz filed a grievance alleging that the Police Department released confidential and personal information in violation of the Police Department's collective bargaining agreement with the Cleveland Police Patrolmen's Association.  (Plaintiff's Ex. 16.)  On January 8, 2002, Chief Mary Bounds denied the grievance stating that the Police Department "does not release personal service records."  (Plaintiff's Ex. 19.)

On April 19, 2002, Mr. Tobin published an article about the Locklear shooting in the Cleveland Plain Dealer.  The article included personal medical information about Lentz.  Specifically, the article published the results of Lentz' pre-employment psychological evaluations conducted by Cleveland.  (Defendants' Ex. H-5, at 2.)

On July 17, 2002, Lentz filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") against Cleveland for unlawful disclosure of medical records in violation of the Americans with Disabilities Act ("ADA").  (Plaintiff's Ex. 28.)  In response, Cleveland filed a position paper admitting that it released the information.  (Plaintiff's Ex. 30.)  However, it has since recanted and now claims that the admission was in error. (Defendants' Ex. YY-1.)

On September 5, 2002, the EEOC issued a determination that Cleveland violated the ADA by releasing Lentz' pre-employment psychological evaluations.  (Plaintiff's Ex. 30).  On December 4, 2003, it issued a "right to sue" letter.  (Defendants' Ex. Z-1.)  On December 15, 2003, Lentz signed an acknowledgment of receipt.  (Defendants' Ex. BBB.)  On March 22, 2004, the current litigation was filed in the Cuyahoga County Court of Common Pleas, (Defendants'

Ex. Z-2.), and removed to federal court on April 8, 2004.  (Docket No. 1.)

Alleging discrimination, retaliation, § 1983, unlawful disclosure, invasion of privacy, malicious prosecution, and abuse of process claims, Lentz is seeking back pay for lost overtime, compensatory damages, attorney fees, legal costs, and injunctive relief.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party moving for summary judgment has the initial burden to either (1) present affirmative evidence negating an element of the non-movant's claim or (2) demonstrate "an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once that burden is met, the non-movant must set forth sufficient evidence to create a genuine issue of material fact.  Klepper v. First Am. Bank, 916 F.2d 337, 342 (6th Cir. 1990).  To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

All reasonable factual inferences must be drawn in favor of the non-movant.  Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Indeed, "[a] mere

-6-

scintilla of evidence is insufficient; rather there must be evidence on which the jury could reasonably find for the non-movant." Humenny, 390 F.3d at 904 (internal quotation omitted).

### III.    LAW AND ANALYSIS

#### A.    Discrimination Claim

A claim of discrimination under 42 U.S.C. § 1981 and O.R.C. § 4112 requires evidence sufficient to make out a prima facie case of discrimination under McDonnell-Douglas.  Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th Cir. 2004); Williams v. Ford Motor Co., 187 F.3d 533, 538 (6th Cir. 1999).  Section 1981 also requires evidence sufficient to show that the discrimination was intentional.  Bell, 351 F.3d at 252-53.

To make out a prima facie case under McDonnell-Douglas, a plaintiff must establish that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) that similarly situated non-protected employees were treated more favorably.  Tally v. Bravo Pitino Restaurant, 61 F.3d 1241, 1246 (6th Cir. 1995).  In a reverse discrimination case, the plaintiff must establish that (1) background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority; and (2) the employer treated differently, similarly situated employees who are not members of the protected class.  Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 801 (6th Cir. 1994).

Once established, the prima facie case creates a rebuttable presumption requiring the defendant to provide some legitimate, non-discriminatory reason for his conduct.  Anthony v. BTR Auto. Sealing Sys., 339 F.3d 506, 515 (6th Cir. 2003).  The defendant's burden is one of production, not persuasion.  Gray v. Toshiba Am. Consumer Prods., 263 F.3d 595, 599 (6th Cir.

2001). The ultimate burden of persuasion rests with the plaintiff to establish that the legitimate, non-discriminatory reason is pretextual. Anthony, 399 F.3d at 515. In doing so, the plaintiff must establish that the reason (1) has no basis in fact; (2) did not actually motivate the challenged conduct; or (3) is insufficient to explain the challenged conduct. See Carter v. University of Toledo, 349 F.3d 269, 274 (6th Cir. 2003). Showing pretext by the first and third methods permit an inference of illegal discrimination. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). Showing pretext by the second method requires the plaintiff to introduce additional evidence of discrimination. Id.

Here, the Defendants argue that Lentz is unable to establish a prima facie case because (1) he did not suffer an adverse employment action and (2) he was not treated differently than similarly situated non-protected employees.

### 1. Adverse Employment Action

To establish an adverse employment action, a plaintiff must identify a materially adverse change with respect to the terms and conditions of his employment. Koscis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996). To determine whether an employment action is materially adverse, the Sixth Circuit focuses on five factors: (1) significant changes in responsibility; (2) decreased salary; (3) less distinguished title; (4) material loss in benefits; and (5) other indices that might be unique to a particular situation. Id. at 886. "Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions." Id. Indeed, the reassignment must be more than a mere inconvenience. Id. However, if the conditions of the reassignment would be objectively intolerable to a reasonable person and thereby amount to a constructive discharge, then it is considered materially adverse.

-8-

Strouss v. Michigan Dept. of Coorections, 250 F.3d 336, 342-43 (6th Cir. 2001).

Here, Lentz alleges that Cleveland used gym duty "as a form of unofficial punishment." (Complaint, at 6.)  He also alleges that because of his time on gym duty, he lost opportunities such as overtime, secondary employment, and other special assignments.  Moreover, he alleges that it is well-known that officers do not like gym duty because it is embarrassing and filthy.  See (Lohn Depo., at 90-92).  The Defendants respond that because Lentz did not lose his designation as a peace officer and because he did not suffer any loss in salary or health benefits, his temporary reassignment to gym duty does not constitute an adverse employment action.

The Defendants are correct that reassignments alone, without a change in salary, title, or benefits, do not generally constitute adverse employment actions.  See Koscis, 97 F.3d at 885. Moreover, "[n]ot everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).  However, lost opportunities for overtime and secondary employment constitute adverse employment actions.  See Broska v. Henderson, 70 Fed. Appx. 262, 267-68 (6th Cir. Jun. 30, 2003); but see Smith v. County of Hamilton, 34 Fed. Appx. 450, 456 (6th Cir. Apr. 19, 2002).  Also, reassignments that include significantly different responsibilities constitute adverse employment actions.  Smith v. City of Salem, 378 F.3d 566, 575-76 (6th Cir. 2004).  Here, because of his reassignment to gym duty, Lentz was not allowed to work secondary employment nor any other special detail.  (Bounds Depo., at 48-50.)  Moreover, a reassignment to gym duty removes an officer from active duty.  Thus, Lentz received no on-duty experience, made no arrests, and received no court time for almost two years.

The unique nature of police work highlights why this reassignment is particularly

undesirable.  See Koscis, 97 F.3d at 886 (stating that other indices that might be unique to a particular situation can render an employment action materially adverse).  Although he defended departmental policy, then-Safety Director James Draper stated that the reason officers dislike gym duty is because they miss the action that accompanies active duty, which is the very reason someone becomes a police officer. (Draper Depo., at 134-35.)  Again, Lentz was removed from active duty for almost two years pending the investigation.

Most instructive is Jackson v. City of Columbus, 194 F.3d 737 (6th Cir. 1999), overruled on other grounds by, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).  In Jackson, the Sixth Circuit held that a police chief's suspension with pay pending a timely investigation does not constitute an adverse employment action.  Id. at 752.  Similarly, in Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000), the Sixth Circuit held that removing the plaintiff from a position for only ten days without a loss in salary does not constitute an adverse employment action.  The corollary to both of these cases is that a suspension with pay or removal for a prolonged period of time can constitute adverse employment actions.  Here, Lentz was effectively removed from active duty and spent almost two years on gym duty, which is more than twice as long as similarly situated non-protected employees.  (Plaintiff's Ex. 58.)[4]

Thus, given (1) the loss opportunities for overtime and secondary employment, (2) the significant differences between gym duty and active duty, (3) the uniqueness of police work

---

[4]    Arguably, Jackson is distinguishable because the plaintiff received an outright suspension as opposed to a reassignment.  However, given that a detail to gym duty effectively removes an officer from active duty and given the length of the investigation, the Court concludes that, under these facts, the distinction between a suspension with pay and a detail to gym duty is immaterial.

rendering this reassignment particularly undesirable, (4) the fact that officers do not like gym duty; and (5) the length of the investigation; the Court concludes that an almost two-year reassignment to gym duty pending an investigation constitutes an adverse employment action.

### 2. Similarly Situated Employees

To establish that similarly situated employees were treated differently, Lentz must show that the comparables are similar in all respects. Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992). Thus, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. However, these factors are not exclusive. Rather, the Sixth Circuit has instructed district courts to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).

Here, Lentz alleges that "[t]he City of Cleveland has developed a pattern of confining white police officers who have been involved in the on duty use of force to the gym for extended periods of time, as a form of unofficial punishment." (Complaint, at 6.) The Defendants argue that Lentz has not provided any evidence that he was treated differently than similarly situated non-protected employees. The Court disagrees. The evidence shows that Lentz' reassignment to gym duty pending his investigation was more than twice as long as any other African American officer who, in the last seven years, used deadly force against an African American suspect while on duty. (Plaintiff's Ex. 58.) The Court recognizes that no shooting incident between an officer

and a citizen will ever be exactly similar and that some investigations may take longer than others.  However, an exact correlation is not required.  Ercegovich, 154 F.3d at 352.  Because Lentz' reassignment was more than twice as long as any other African American officer who used deadly force against an African American suspect in the last seven years, the Court concludes that Lentz has set forth sufficient evidence that he was treated less favorably than similarly situated non-protected employees.[5]

Because the Defendants do not challenge any other factors necessary to establish a prima facie case in their motion for summary judgment, the Court concludes that Lentz has set forth sufficient evidence to establish a prima facie case for reverse discrimination.

### 3.    Legitimate, Non-Discriminatory Reasons

Once a prima facie case has been established, the burden shifts to the Defendants to provide legitimate, nondiscriminatory reasons for their conduct.  BTR Auto., 339 F.3d at 515.  Here, the Defendants argue that Lentz' reassignment to gym duty was pursuant to the Police Department's "use of deadly force" policy.  Also, they argue that given the complexity of the case, the change in administration, the chief prosecutor vacancy, and the backlog of police shootings involving fatalities, the decision to keep Lentz on gym duty for 652 days was legitimate and non-discriminatory.

---

[5]    Lentz also cites statistical evidence presented by Dr. Bryan Pesta showing a disparity in gym assignments based on the race of the suspect.  (Plaintiff's Ex. 58.)  However, it is not the race of the suspect that is relevant; it is the race of the officer involved in the shooting.  To support his claim, Lentz must show that white police officers who shot African American suspects received longer gym assignments than similarly situated non-white officers.  Thus, Dr. Pesta's analysis and conclusions based on the race of the suspect are irrelevant.

### 4.    Pretext

The ultimate burden rests with Lentz to show that these legitimate, non-discriminatory reasons (1) have no basis in fact; (2) did not actually motivate the challenged conduct; or (3) are insufficient to explain the challenged conduct.  See Carter, 349 F.3d at 274.  Lentz concedes that his initial reassignment was per departmental policy.  However, he contends that the policy only calls for 45 days.  Here, Lentz was on gym duty for 652 days.

Lentz has not established the existence of a 45-day policy.  Chief Lohn stated that the 45-day policy was a myth.  (Lohn Depo., at 132.)  Rather, departmental practice at the time required that an officer remain on gym duty until (1) the city prosecutor issued a ruling and (2) the officer received clearance from the Medical Unit.  (Defendants' Ex. N; Draper Depo., at 112-13; Lohn Depo., at 133.)  Although Sergeant Janice Abernathy sent a memo to Chief Bounds indicating that Lentz was to be detailed to gym duty for 45 days, that memo does not establish a policy. (Plaintiff's Ex. 20.)  Even if there was such a policy, the fact that Lentz was detailed to gym duty beyond 45 days is immaterial.  In fact, of the fifty-eight most recent UDF incidents, all but one officer served more than 45 days.  (Plaintiff's Ex. 58.)  Thus, even if Cleveland violated an alleged 45-day policy, the violation was certainly not unique to Lentz.

The Defendants attempt to justify the length of Lentz' reassignment because of (1) the change in administration, (Lohn Depo., at 119-20), (2) the chief prosecutor vacancy, (Draper Depo., at 68); (3) the complexity of the case; and (4) the high number of police shootings involving fatalities that received priority.  As Chief Prosecutor Watson stated,

> When I started in the Prosecutor's Office in October, the position of Chief Prosecutor was vacant for ten months, and there was, when I arrived, a backlog of cases, including use of deadly force cases, including Internal Affairs cases.  In addition to that I had an office that was short-staffed and I had a number of obligations.  So

-13-

> when I reviewed cases, I reviewed them as quickly as possible in the time that I had
> given the other obligations of the job that I had in front of me.  So, you know, it
> didn't take whatever period time that is to review this case.  This was not the only
> case in front of me.  There were other things that were time-sensitive.  And this was
> one of many obligations in terms of my job duties as a Chief Prosecutor when I
> started.

(Watson Depo., at 113.)  In fact, most of the officers involved in on-duty shootings during that

particular time served disproportionately long times on gym duty, though still nowhere near as

long as Lentz.  (Plaintiff's Ex. 58.)

Lentz counters that the real reason for his prolonged reassignment was discriminatory.

Safety Director Draper admitted that the Lentz case was a "hot issue."  (Draper Depo., at 81.)

Also, there was consistent media coverage of the issue.  (Plaintiff's Ex. 9, 14, 24, 25, 35, 40, 42,

42A, & 45).  Contrary to the Defendants' contention, three of the articles cited by Lentz suggest

public outrage over the shooting.  (Plaintiff's Ex. 14, 35, & 40.)  Then-Mayor Michael White

publicly called for disciplinary action to be taken against Lentz.  (Plaintiff's Ex. 14.)  Moreover,

the Department of Justice ("DOJ") met with Safety Director Draper and raised concerns about

how UDF incidents were being handled by the Police Department.  (Draper Depo., at 52-53.)  In

their conclusion, the DOJ noted that the Police Department's lack of documentation regarding

UDF investigations raised concerns about competency, thoroughness, and impartiality.  (Draper

Depo., at 61-62; Lohn Depo., at 58.)

Lentz also points to comments made by Safety Director Draper that "the Mayor, the

Chief and I have concern for how the investigation will be perceived."  (Draper Depo., at 83-84.)

Draper also stated that given the number of police shootings, "we didn't want to go through a

Cincinnati."  Id. at 82-83.  Although his primary concern was the integrity of the investigation,

he conceded that community perception remained a secondary concern and that given the

backdrop of the Cincinnati riots, civil unrest was always in the back of his mind.  Id.

In conjunction with this affirmative evidence, Lentz argues that his felonious assault charge so lacked probable cause, that any legitimate, non-discriminatory reason provided by the Defendants is insufficient to justify their actions.  If a plaintiff can show insufficiency, then an inference of discrimination arises.  Kline v. Tennessee Valley Auth., 128 F.3d 337, 346 (6th Cir. 1997).  Under Ohio law, probable cause is defined as "[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense which is he charged."  Thacker v. City of Columbus, 328 F.3d 244, 261 (6th Cir. 2003) (quotation omitted).

According to Lentz, he was more than justified to use deadly force when he was on top of a speeding vehicle heading towards a busy intersection while several pedestrians and school children were in danger of being struck.  Indeed, according to departmental policy, an officer is justified in discharging his weapon if he is attempting to protect himself or others from an actual or clearly apparent threat of death or serious physical harm, with no other reasonable alternative.  (Plaintiff's Ex. 1, at 1.)  Lentz believes he was justified.  The grand jury apparently agreed.  In fact, when asked whether, under these circumstances, Lentz would be justified in believing that his life was in danger, Prosecutors Buelow and Watson each stated, "I don't know."  (Buelow Depo., at 37-38; Watson Depo., at 51, 87.)  Nonetheless, each found probable cause to charge Lentz with felonious assault.

In weighing the evidence, the Court concludes that although his time in gym duty has been explained in some regard, the Court still has reservations.  After three months of investigation, the file was considered complete, probable cause was found, and the case was

-15-

submitted to the grand jury. The file was then removed from the grand jury and reopened. Lt. Klimak conceded that this is quite unusual. (Kimak Depo., at 161, 166.) He also conceded that his additional six months of investigation did not reveal any information that was contrary to what was already in the original file. (Defendants' Ex. A-1.)

Fourteen months had passed before Lentz was even charged and still, the grand jury returned no indictment on the felonious assault charge. Although the general policy is to reinstate an officer after the prosecutor issues a ruling in the officer's favor, this did not happen in Lentz' case. He remained on gym duty for an additional 52 days. Even after his acquittal, the Defendants pursued departmental charges. Safety Director Draper admitted that this was also contrary to normal procedure. (Defendants' Ex. S.) Here, the departmental charges were dismissed only after Lentz entered a plea of no contest to the "failure to notify" charge.

Given these unusual circumstances, coupled with the media attention, the DOJ investigation, the concern over public perception, and the fact that all reasonable factual inferences are to be drawn in Lentz' favor, the Court concludes that he has set forth sufficient evidence so that a reasonable jury could conclude that his prolonged detail to gym duty and the filing of criminal and departmental charges were all based upon his race to alleviate public concern and thus, discriminatory. Moreover, a reasonable jury could conclude, based on these facts, that the charge of felonious assault was so lacking in probable cause that any legitimate, non-discriminatory reason offered by the Defendants is insufficient to justify charging him twice with felonious assault and then pursuing departmental charges after the grand jury refused to return an indictment. The motion for summary judgment with regard to the reverse discrimination claim is denied.

In doing so, the Court recognizes a recent Sixth Circuit opinion cautioning district courts from granting summary judgment on such elusive questions as an employer's true intent for discriminating against an employee after he has set forth a prima facie case.  See Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 564 (6th Cir. 2004).  The Sixth Circuit reasoned that "an employer's true motivations are particularly difficult to ascertain . . . thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." Id. (Citations omitted).

**B.   Retaliation Claims**

In order to establish a retaliation claim, a plaintiff must establish that (1) he engaged in some protected activity, (2) the exercise of the protected activity was known to the employer; (3) he suffered an adverse employment decision; and (4) there is some causal link between the protected activity and the adverse employment decision.  Ford v. GMC, 305 F.3d 545, 552 (6th Cir. 2000) (citation omitted); Penny v. UPS, 128 F.3d 408, 417 (6th Cir. 1997).  The burden of establishing a prima facie case is not onerous, but one easily met.  EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).  Once a prima facie case is established, the burden of production shifts to the defendant to provide some legitimate, non-discriminatory reason for his conduct.  Carter, 349 F.3d at 274.  Again, the ultimate burden of persuasion rests with the plaintiff to show that any legitimate, non-discriminatory reason is pretextual by establishing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the challenged conduct; or (3) is insufficient to explain the challenged conduct.  See id.

Lentz alleges two protected activities: (1) the December 21, 2001 grievance charge and

(2) the July 17, 2002 EEOC charge.[6]  He also raises five adverse employment actions:

    (1)     The crushing of the car involved in the shooting;
    (2)     The repeated disclosure of confidential documents;
    (3)     The charge of felonious assault;
    (4)     The extended assignment to the gymnasium and suspension without pay; and
    (5)     The filing of departmental charges

(Complaint, at 7-8.)  The car crushing, the disclosure of records, and the felonious assault charge all arguably do not constitute adverse employment actions because they do not affect the terms and conditions of Lentz' employment.  See Koscis, 97 F.3d at 885.  However, the Sixth Circuit has never addressed whether retaliation claims are limited to "employment-related" retaliation. See e.g. White v. Burlington Northern & Sante Fe Railway Co., 364 F.3d 789, 799 n.8 (6th Cir. 2004) (en banc) (declining to address the issue); EEOC v. Outback Steakhouse of Florida, Inc., 75 F. Supp. 2d 756, 759 (N.D. Ohio 1999).  Several district courts in this circuit have expanded retaliation claims to include adverse actions that do not affect the terms and conditions of one's employment.  See e.g. Outback Steakhouse, 75 F. Supp. 2d at 759; Gill v. Rinker Materials Corp., 91 Fair Empl. Prac. Case (BNA) 179 (E.D. Tenn. 2003); Gliatta v. Tectum, Inc., 211 F. Supp. 2d 992 (S.D. Ohio 2002).  Thus, the Court will analyze all five adverse actions regardless of whether they affected the terms and conditions of Lentz' employment.

    **1.   Car Crushing**

---

[6]      Cleveland argues that the filing of the grievance charge was not a protected activity because it did not specifically mention the ADA.  To engage in a protected activity, an employee must oppose "any act or practice made unlawful by [the ADA]."  42 U.S.C. § 12203(a).  The ADA clearly protects an employee from the unlawful disclosure of his medical information by his employer.  See 42 U.S.C. § 12112(d)(3).  Because the grievance charge specifically alleges that Cleveland released Lentz' personal service records in violation of federal law, the Court concludes that it sufficiently constitutes protected activity.

On September 9, 2002, the Division of Police designated the car involved in the shooting for junk.  (Defendants' Ex. C-1, at 2.)  On September 27, 2002, it was released for scrapping and its evidentiary value was destroyed.  Id. at 9.  Lentz argues that this action was taken in retaliation of his filing of grievance and EEOC charges.[7]  However, there is no evidence that Officer Robert Noss and Sergeant Emily Frazier, the officers who decided to scrap the car, were either aware of any protected activity or interacted with individuals who were aware.  Thus, Lentz cannot establish that the relevant decision-makers knew about his protected activities.  Fenton v. HiSAN, Inc., 174 F.3d 827, 832 (6th Cir. 1999); Mulhall v. Ashcroft, 287 F.3d 543, 553-54 (6th Cir. 2002).

Lentz is also unable to show that the car crushing was adverse.  Cleveland continued to represent Lentz in the civil case, agreed to indemnify him for all liability, and reimbursed him for all fees incurred in the criminal case.  There is no evidence that the car crushing prejudiced Lentz in any way.  Rather, Lentz merely alleges that "the vehicle could have provided exculpatory [evidence]."  (Docket No. 52, at 19.)  However, the civil case was settled and the criminal case was dismissed before he had an opportunity to present any evidence.  Lentz must show that the car crushing was, in fact, adverse to him, not that it could have been adverse had he been required to present evidence in either of the state cases.

Finally, Lentz has not established a causal connection.  To establish a causal connection, a plaintiff must provide evidence to raise a sufficient inference that the protected activity was the

---

[7]     Lentz points out that the car crushing took place just days after the EEOC issued its finding of probable cause.  (Plaintiff's Ex. 30.)  However, this fact is irrelevant because a plaintiff takes no part in the EEOC's determination of probable cause and cannot be a basis for establishing a retaliation claim.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

likely reason for the adverse employment action.  Avery Dennison, 104 F.3d at 861.  Lentz argues that temporal proximity alone is sufficient to establish an inference of retaliation.  There is some confusion in the case law on this point.  Compare Nguyen v. City of Cleveland, 229 F.3d 559, 565-67 (6th Cir. 2000) (holding that temporal proximity alone is generally insufficient to raise an inference of retaliation) and Cooper v. City of North Olmstead, 795 F.2d 1265, 1272 (6th Cir. 1986) (holding that temporal proximity alone (4 months) is insufficient to raise an inference of retaliation; with DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004) (holding that temporal proximity alone (21 days) is sufficient to establish an inference of retaliation) and Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (holding that temporal proximity alone (3 months) is sufficient to establish an inference of retaliation).

In Steiner v. Henderson, the Sixth Circuit, in an unpublished opinion, clarified that although temporal proximity is relevant to the question of causation, standing alone, it is only sufficient to establish an inference of retaliation "when there is no compelling evidence to the contrary."  2005 U.S. App. LEXIS 1584, *9-12 (6th Cir. Jan. 31, 2005).  Moreover, the Sixth Circuit has held that anything over six months is generally insufficient, standing alone, to establish a causal connection.  See Sanchez v. Caldera, 36 Fed. Appx. 844, 846 (6th Cir. Jun. 11, 2002) (citing Nguyen, 229 F.3d at 566-67); Parnell v. West, 1997 U.S. App. LEXIS 12023, *7 (6th Cir. May 21, 1997).

Here, because Lentz relies solely on temporal proximity and there is substantial evidence supporting the Defendants version of the facts, he is unable to establish a causal connection.  See Nguyen, 229 F.3d at 567.  Specifically, the Defendants allege that the car crushing was due to a series of inadvertent clerical mistakes because the procedures involving placing holds on cars

-20-

were not clearly defined or understood by division personnel.  (Defendants' Ex. A-1.)  On

October 3, 2002, Lt. Klimak ordered an investigation into the crushing.  (Defendants' Ex. C-1, at

1.)  The Internal Affairs Unit concluded that the car was destroyed by mistake and not to hide

evidence.  Id. at 10.  The report made recommendations to prevent such future clerical mistakes

from occurring.  Id. at 11.  Lentz has made no attempt to challenge the veracity of the report.

Even if Lentz had established a prima facie case, he has made no attempt to show that the

Defendants' legitimate, non-discriminatory reason for the car crushing (inadvertent clerical

mistake) was pretextual.  Thus, Lentz is only left with the argument that because the car crushing

occurred months after the filing of the EEOC charge, an inference of retaliation arises.  Although

temporal proximity is relevant when establishing a prima facie case, "temporal proximity is

insufficient in and of itself to establish that the employer's nondiscriminatory reason for

discharging an employee was in fact pretextual."  Skrjanc v. Great Lakes Power Serv. Co., 272

F.3d 309, 317 (6th Cir. 2001).

### 2.    Repeated Disclosure of Medical Documents

On December 8, 2001 and February 7, 2003, Cleveland allegedly released confidential

medical information about Lentz in violation of federal and state law.  Because the December 8,

2001 alleged release occurred prior to any protected activity, the only relevant issue is whether

the February 7, 2003 alleged release was retaliatory.

On February 6, 2003, Dawn Piros from News Channel 5 requested a copy of Lentz'

personnel file.  (Defendants' Ex. M, at 7.)  Safety Director Draper and Assistant Director Laura

Palinkas were assigned to the request.  Id.  On February 7, 2003, the file was released.  Id.

Director Draper was aware that Lentz filed an EEOC charge.  (Draper Depo., at 145.)  Thus,

-21-

Lentz is able to show that the relevant decision-makers were aware of his protected activity. <u>Fenton</u>, 174 F.3d at 832.

However, Lentz is unable to establish that the February 7, 2003 release included any adverse information or that it even violated federal or state law.  Under Ohio law, personnel records of police officers are generally considered public records.  <u>State ex rel. Multimedia, Inc. v. Snowden</u>, 72 Ohio St. 3d 141, 142 (Ohio 1995).  However, under both federal and state law, medical records are not considered public records and must be kept confidential.  <u>See</u> <u>infra</u> Section H.  Thus, the document release will only be considered adverse if it contained medical or other such private information.

The only information known about the February 7, 2003 release is that it included Lentz' personnel file.  (Defendants' Ex. M, at 7.)  Lentz has not provided any evidence to suggest that it also included his pre-employment psychological evaluations.  In fact, the evidence suggests otherwise.  Emails, dated January 24, 2002, indicate that the personnel in charge of releasing public records understood that Lentz' medical records were not to be released.  (Plaintiff's Ex. 22.)  On May 24, 2002, the Police Department reassured Lentz' attorney that document releases would not include his pre-employment psychological evaluations.  (Plaintiff's Ex. 27, at 2.)  On September 5, 2002, the EEOC informed Cleveland that releasing pre-employment psychological evaluations would violate the ADA.  (Plaintiff's Ex. 30.)  Finally, Chief Lohn affirmatively stated that the Police Department does not release medical records.  (Lohn Depo., at 165.)  Thus, absent any evidence that the February 6, 2003 did, in fact, include Lentz' pre-employment psychological evaluations or any other protected information, he is unable to show that the release was adverse to him.

-22-

Finally, Lentz, again, relies solely on temporal proximity to establish a causal connection, which is generally insufficient to raise an inference of causation.  Nguyen, 229 F.3d at 565-67.  Moreover, the February 7, 2003 release occurred six and a half months after Lentz made his EEOC filing.  Even if temporal proximity alone sufficed, the Sixth Circuit would generally require a proximity of less than six months.  See Sanchez, 36 Fed. Appx. at 846 (citing Nguyen, 229 F.3d at 566-67); Parnell, 1997 U.S. App. LEXIS at *7.  Thus, Lentz has not set forth sufficient evidence to establish a prima facie case for retaliation.

### 3.    Charge of Felonious Assault

On February 5, 2003, Prosecutor Watson charged Lentz with felonious assault.  Lentz argues that he was charged in retaliation for filing grievance and EEOC charges.  Although the Sixth Circuit has not addressed the issue, several courts have held that the filing of a civil lawsuit, not in good faith and in retaliation, can be the basis for an employment retaliation claim.  See generally Outback Steakhouse, 75 F. Supp. 2d at 758 (citing Harmar v. United Airlines, Inc., 1996 U.S. Dist. LEXIS 5346, *2-3 (N.D. Ill April 23, 1996) (collecting cases)).  However, the Court is unable to find any case law to support the notion that the filing of criminal charges can be the basis for an employment retaliation claim.  The most likely reason is because a prosecutor, not an employer, makes the final decision to bring criminal charges, thus breaking the chain of causation.  See e.g. Dokes v. Jefferson County, 2003 U.S. App. LEXIS 5753, *20-21 (6th Cir. Mar. 20, 2003) (Gwin, D. J., concurring).  Here, Prosecutor Watson had sole authority to charge Lentz.  (Lohn Depo., at 31-32, 66; Watson Depo., at 23, 110-11.)  Although the Court is not foreclosing the possibility that in some circumstances, the filing of criminal charges could be the basis for an employment retaliation claim, the Court concludes that these facts do not require

-23-

such a finding.

Moreover, Lentz has not set forth any evidence to show that Prosecutors Buelow and Watson were aware that he filed grievance and EEOC charges when they each charged him with felonious assault, nor that they interacted with individuals who had such knowledge.  Watson specifically denies having such knowledge.  (Defendants' Ex. O.)  Thus, Lentz has not shown that the relevant decision-makers had knowledge of his protected activities.  Fenton, 174 F.3d at 832; Mulhall, 287 F.3d at 553-54.[8]

Finally, Lentz, again, relies solely on temporal proximity to establish a causal connection, which is generally insufficient to raise an inference of causation.  Nguyen, 229 F.3d at 565-67.  Specifically, there is no evidence that Prosecutor Buelow filed a charge of felonious assault with specific intent to retaliate against Lentz for filing a grievance charge; or that Prosecutor Watson, eleven months later, re-filed the charge with specific intent to retaliate against Lentz for filing an EEOC charge.  Moreover, Lentz was charged almost six and a half months after the EEOC charge was filed.  Even if temporal proximity alone sufficed, the Sixth Circuit generally requires a proximity of less than six months.  See Sanchez, 36 Fed. Appx. at 846 (citing Nguyen, 229 F.3d at 566-67); Parnell, 1997 U.S. App. at *7.  Thus, Lentz has not set forth sufficient evidence to establish a prima facie case for retaliation.[9]

---

[8]     The Court does conclude that the filing of the felonious assault charge was materially adverse to Lentz because it resulted in his immediate arrest and suspension without pay.  Although he was subsequently reinstated with back pay, the Sixth Circuit has recently rejected the "ultimate employment decision" standard whereby negative employment actions are not considered adverse when they are subsequently corrected by the employer.  Smith, 378 F.3d at 576.

[9]     Lentz notes that the felonious assault charge was filed less than a week after he threatened to withdraw his settlement demand.  The Court does not see why this

### 4.    Extended Assignment to the Gymnasium and Suspension Without Pay

Lentz alleges that his prolonged reassignment to gym duty pursuant to the fourteen month UDF investigation and his two month suspension without pay were both in retaliation for the filing of grievance and EEOC charges.

Chief Bounds, Director Draper, and Chief Lohn all reviewed, discussed and monitored the Lentz investigation.  (Bounds Depo., at 12, 28-31, 36-37; Draper Depo., at 94-98, 111.)  Chief Lohn had final authority to detail Lentz to gym duty.  (Lohn Depo., at 189-96.)  All three individuals were aware that Lentz engaged in some protected activity.  (Plaintiff's Ex. 19; Draper Depo., at 145-48.)  Thus, Lentz is able to establish that the relevant decision-makers were aware of his protected activities.  Fenton, 174 F.3d at 832.

The Court has already concluded that Lentz' detail to gym duty pending the 14-month investigation constitutes an adverse employment action.  Also, the suspension without pay constitutes an adverse employment action regardless of the fact that Lentz was subsequently reinstated with back pay.  See Smith, 378 F.3d at 576.

However, Lentz is unable to establish a causal connection.  Lentz was first detailed to gym duty prior to engaging in any protected activity.  Moreover, Lentz was already detailed to gym duty for almost six months when he filed his EEOC charge.  There is simply no evidence to support the conclusion that the Police Department kept Lentz on gym duty thereafter because he filed an EEOC charge.  With regard to his suspension without pay, Lentz again relies solely on

_____

fact is relevant.  While the filing of an EEOC charge is a protected activity under Title VII, Lentz does not cite any authority to support the idea that threatening to withdraw a settlement demand is also a protected activity.  Nor does he allege that Prosecutor Watson knew that he threatened to withdraw his settlement demand.

-25-

temporal proximity which is generally insufficient to raise an inference of causation.  <u>Nguyen</u>, 229 F.3d at 565-67.  Moreover, he was suspended almost six and a half months after he filed his EEOC charge.  Even if temporal proximity alone sufficed, the Sixth Circuit generally requires a proximity of less than six months.  <u>See</u> <u>Sanchez</u>, 36 Fed. Appx. at 846 (<u>citing</u> <u>Nguyen</u>, 229 F.3d at 566-67); <u>Parnell</u>, 1997 U.S. App. at *7.  Thus, Lentz is unable to establish a prima facie case.

Even if Lentz had set forth a prima facie case, he is unable to show that the legitimate, non-discriminatory reasons offered by the Defendants are pretextual.  With regard to his suspension without pay, departmental policy requires that whenever an officer is charged with a felony, he is suspended.  (Lohn Deop., at 175.)  Here, Lentz was suspended when he was charged with felonious assault and reinstated with back pay when the grand jury refused to indict him.  Lentz has not offered any evidence to suggest that this policy is untrue, insufficient to justify his suspension, or that the true reason for his suspension was retaliatory.  <u>Carter</u>, 349 F.3d at 274.  With regard to the extended detail to gym duty, Lentz is also unable to establish pretext.  The Defendants re-assert that the extended detail to gym duty was justified because (1) it was per the"use of deadly force" policy, (2) the case was particularly complex, (3) there was a change in administration, and (4) there was a backlog of police shootings involving fatalities, which received priority.  The Court has already concluded that although these legitimate, non-discriminatory reasons adequately explain the Defendants' conduct in some respects, the Court still had reservations given (1) the media attention, (2) the DOJ investigation, and (3) statements made by Cleveland officials that they were concerned with public perception and civil unrest.  Although these three pieces of evidence, if believed, would allow a reasonable jury to conclude that the Defendants were motivated by discrimination to alleviate community concern, none of

this evidence supports the notion that they were also motivated by retaliation because Lentz filed grievance and EEOC charges relating to the disclosure of his personnel file. See Mallory v. Noble Corr. Inst., 45 Fed. Appx. 463, 473 (6th Cir. Sept. 3, 2002) (indicating that evidence sufficient to support that an employer's true motive was discriminatory does not necessarily support that the employer was also motivated by retaliation).

Indeed, the only thing Lentz asserts with regard to pretext and his retaliation claim is that "the law regarding evidence of pretext is essentially the same for Officer Lentz's retaliation claim as it is for his discrimination claim." (Docket No. 52, at 21.)  Although the legal concepts are the same, Lentz overlooks the fact that none of his evidence on pretext even refers to his retaliation claim.  The only evidence that would arguably allow a jury to conclude that the Defendants were motivated by retaliation is that the felonious assault charge so lacked probable cause that any justification offered by the Defendants is simply insufficient.  However, Prosecutors Buelow and Watson, who had sole authority to charge Lentz, were unaware that he engaged in any protected activity.  Thus, absent any evidence that the Defendants' legitimate, non-discriminatory reasons were a pretext for retaliation, as opposed to discrimination, the Court concludes that Lentz has not set forth sufficient evidence so that a reasonable jury could conclude that his extended detail to gym duty and suspension without pay were retaliatory because he filed an EEOC charge regarding the disclosure of his personnel records.

### 5.    The Filing of Departmental Charges

Lentz alleges that the filing of departmental charges was in retaliation for his filing of grievance and EEOC charges.  Chief Lohn and Safety Director Draper had sole authority to pursue departmental charges.  (Lohn Depo., at 137-38.)  Both were aware that Lentz filed an

EEOC charge.  (Draper Depo., at 145-48.)  Thus, Lentz is able to establish that the relevant

decision-makers knew of his protected activities.  Fenton, 174 F.3d at 832.[10]

However, Lentz is unable to establish a causal connection.  Again, Lentz relies solely on

temporal proximity, which is generally insufficient to establish causation.  Nguyen, 229 F.3d at

565-67.  Moreover, the pursuit of the departmental charges took place almost a year after Lentz

filed his EEOC charge.  Even if temporal proximity alone sufficed, the Sixth Circuit generally

requires a proximity of less than six months.  See Sanchez, 36 Fed. Appx. at 846 (citing

Nguyen, 229 F.3d at 566-67); Parnell, 1997 U.S. App. at *7.  Thus, Lentz has not set forth

sufficient evidence to establish a prima facie.

The motion for summary judgement with regard to the retaliation claim is granted.

**C.    ADA Claim**

To recover under Title I of the Americans with Disabilities Act ("ADA), a plaintiff must

file a charge of discrimination with the EEOC within 180 days of the alleged violation.  See 42

U.S.C. § 12117(a) (deferring to 42 U.S.C. § 2000e-5); Stewart v. County of Brown, 86 F.3d 107,

110 (7th Cir. 1996).  Thereafter, a plaintiff must file suit within 90 days of receiving his "right to

sue" letter.  See id.; McKibbin v. Hamilton County, 2000 U.S. App. LEXIS 12123, *7-8 (6th Cir.

May 30, 2000).  The 90-day filing requirement is not a jurisdictional requirement, but rather a

---

[10]    The filing of departmental charges, in and of itself, does not constitute an adverse
employment action.  Anti-discrimination and retaliation statutes do not insulate an
employee from discipline for violating his employer's rules.  See Kiel v. Select
Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999); Mattern v. Eastman Kodak
Co., 104 F.3d 702, 708 (5th Cir. 1997); Booker v. Brown & Williamsom Tobacco
Co., 879 F.2d 1304, 1312 (6th Cir. 1989).  Moreover, Lentz entered a plea of no
contest to the "failure to notify" charge, which validates at least one of the
departmental charges.  (Defendants' Exs. GG-1, at 6; GG-2, at 4-5.)

timing requirement subject to waiver, estoppel, and equitable tolling.  <u>Truitt v. County of Wayne</u>, 148 F.3d 644, 646-47 (6th Cir. 1998).

Federal courts strictly enforce the 90-day filing requirement.  Indeed, the Sixth Circuit upheld a grant of summary judgment in favor of a defendant when the plaintiff missed the 90-day requirement by a single day.  <u>See</u> <u>Vaughn v. American Standard Graphic</u>, 885 F.2d 331 (6th Cir. 1989).  The Supreme Court has cautioned, "procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants."  <u>Baldwin County Welcome Center v. Brown</u>, 466 U.S. 147, 152 (1984).  In another case, the Supreme Court explained, "experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."  <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980).

Here, Lentz signed an acknowledgment of receipt of his "right to sue" letter on December 15, 2003.  (Defendants Ex. BBB.)  He concedes that the 90-day period is established by his "written acknowledgment of receipt."  (Docket No. 52, at 23.)  Thus, he had 90-days, until March 15, 2004, to file his lawsuit.  <u>See</u> 42 U.S.C. § 12117(a) (<u>deferring to</u> 42 U.S.C. § 2000e-5); <u>McKibbin</u>, 2000 U.S. App. LEXIS at *7-8.  Yet, he did not file the above-captioned case until March 22, 2004, seven days too late.  (Defendants' Ex. Z-2.)

Although the 90-day filing requirement is subject to waiver, estoppel, and equitable tolling, federal courts sparingly bestow equitable tolling.  <u>Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.</u>, 209 F.3d 552, 560-61 (6th Cir. 2000).  Indeed, absent compelling equitable considerations, the Sixth Circuit will not extend filing limitations by a single day.  <u>Id.</u> Here, Lentz had actual knowledge of the filing requirement and has offered no justification for

his late filing.  Thus, his ADA claim for unlawful disclosure is procedurally barred as it was filed seven days too late.  The motion for summary judgment with regard to the ADA claim is granted.

### D.    42 U.S.C. § 1983 Claim

To prevail on a § 1983 claim, a plaintiff "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." Waters v. City of Morristown, 242 F.3d 353 358-59 (6th Cir. 2001).  Because Director Watson and Chief Lohn are being sued solely in their official capacities, the only real party at interest is the governmental entity whose policy or custom played a part in the alleged violation of federal law.  Gean v. Hattaway, 330 F.3d 758, 766 (6th Cir. 2003).  Accordingly, Lentz must show "a direct causal link between the policy and the alleged constitutional violation such that the [city's] deliberate conduct can be deemed the moving force behind the violation."  Graham v. County of Washtenaw, 358 F.3d 377, 383 (6th Cir. 2004) (quotations omitted).

Evidence sufficient to establish a Title VII discrimination claim is also sufficient to set forth a § 1983 claim.  Boutros v. Canton Regional Transit Auth., 997 F.2d 198, 202-03 (6th Cir. 1993).  Because Lentz has established a prima facie case of discrimination, the only remaining issue is whether the alleged discrimination resulted from a city policy or custom so that it can be deemed the "moving force behind the violation."  Graham, 358 F.3d at 383.

Defendants argue that Lentz has not set forth sufficient evidence to establish a city policy or custom.  They note that Cleveland had no reason to believe that there was a problem regarding white police officers and the UDF policy.  Lentz counters that municipal liability may be imposed even by a single decision if the decision-maker had "final decision-making authority."

-30-

See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986); Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

Here, Lt. Klimak had authority to re-open the investigation even though it would, in effect, indefinitely extend Lentz' detail to gym duty.  (Lohn Depo., at 104-07; Klimak Depo., at 25.)  Chief Lohn had final authority to detail Lentz to gym duty.  (Lohn Depo., at 189-96.)  Prosecutor Watson had final authority to charge Lentz.  (Lohn Depo., at 31-32, 66; Watson Depo., at 23, 110-11.)  Chief Lohn and Director Draper had final authority to bring departmental charges against Lentz.  (Lohn Depo., at 137-38.)  Moreover, several key high-ranking officials monitored and publicly commented on the Lentz case.  Then-Mayor Michael White publicly called for disciplinary action to be taken against Lentz.  (Plaintiff's Ex. 14.)  Director Draper personally reviewed the Lentz file.  (Draper Depo., at 85.)  Chief Lohn, Director Draper, and Mayor Campbell frequently met to discuss the investigation and several council members voiced their own concerns, prompting separate hearings.  (Draper Depo., at 81, 113-14; Plaintiff's Ex. 40.)  Indeed, for many high-ranking officials, the Lentz case was a "hot issue."  (Draper Depo., at 81.)  Accordingly, the Court concludes that if a jury finds that the Defendants' conduct was discriminatory, sufficient evidence exists to raise an issue of material fact as to whether the alleged conduct was the product of a city policy or custom.  Pembaur, 475 U.S. at 480; Thomas, 398 F.3d at 429.  The motion for summary judgment with regard to the § 1983 claim is denied.

### E.    O.R.C. § 2744.02:  Municipal Immunity

Cleveland argues that it is immune from liability with respect to the malicious prosecution, abuse of process, and invasion of privacy claims.  In 1985, the Ohio General Assembly enacted the Political Subdivision Tort Liability Act in response to the judicial

abolishment of the doctrine of sovereign immunity.  Franks v. Lopez, 632 N.E.2d 502, 504 (Ohio 1994).  Generally, political subdivisions are immune from liability "for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision . . . in connection with governmental or proprietary function."  O.R.C. § 2744.02(A)(1).  The Act contains several exceptions.  See O.R.C. § 2744.02(B).  However, immunity can be reinstated under O.R.C. § 2744.03.  Theobald v. Board of County Comm'rs, 332 F.3d 414, 416 (6th Cir. 2003); Cater v. City of Cleveland, 697 N.E.2d 610, 615 (Ohio 1998).  Specifically, under O.R.C. § 2744.03(A)(1), a political subdivision is immune from liability if the injury resulted from an employee's "performance of a judicial, quasi-judicial, prosecutorial, legislative, or quasi-legislative function."  However, the Act does not apply to civil actions brought by an employee against his political subdivision "relative to any matter that arises out of the employment relationship between the employee and the political subdivision."  See O.R.C. § 2744.09(B).

Here, because Prosecutor Watson was performing prosecutorial functions, Cleveland is immune from liability with respect to the malicious prosecution and abuse of process claims.  See O.R.C. § 2744.03(A)(1).  Although O.R.C. § 2744.09(B) creates an exception for civil actions brought by an employee, under Ohio law, malicious prosecution claims do not arise out of one's employment.  Rather, malicious prosecution claims involve "purely personal rights that in no way [are] created by or dependent upon the existence of [one's] employment relationship with the city."  Nungster v. City of Cincinnati, 100 Ohio App. 3d 561, 567 (1st App. Dist. 1995).  The Court concludes that this reasoning would likewise apply to an abuse of process claim.[11]

---

[11]     Lentz does not dispute that Cleveland is immune under § 2744.03.  Rather, Lentz argues that § 2744.03 is unconstitutional under Section 16, Article I of the Ohio Constitution.  Although Justice Pfeifer expressed such a view in Garrett v.

-32-

However, the same cannot be said for the invasion of privacy claim.  The protection of an employee's medical records certainly does involve a personal right that is both created by and dependent upon the existence of one's employment.  Indeed, Lentz was required to submit to a psychological evaluation as a condition of his employment.  Accordingly, all four Ohio courts that have addressed this issue agree that O.R.C. § 2744.09(B) protects an employee's right to sue his political subdivision for invasion of privacy. See e.g. Davis v. City of Cleveland, 2004 Ohio App. LEXIS 6038, *17-18 (8th App. Dist. Dec. 9, 2004); Engelman v. Cincinnati Bd. of Educ., 2001 Ohio App. LEXIS 2728, *16 (1st App. Dist Jun. 22, 2001); Ross v. Trumbell County, 2001 Ohio App. LEXIS 495, *24 (11th App. Dist. Feb. 9, 2001);  Patrolman "X" v. Toledo, 1996 Ohio Misc. LEXIS 114, *36-37 (Lucas Cty. Ct. of Common Plea, Apr. 22, 1996).  Thus, Cleveland is not immune from liability with respect to the invasion of privacy claim.

## F.    Malicious Prosecution / Abuse of Process Claims

Lentz alleges that the charges of felonious assault and misdemeanor falsification were filed with malicious intent to quell public outcry over the shooting incident.  In Ohio, to prevail on a malicious prosecution claim, a plaintiff must show "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the [criminal] defendant." Trussell v. General Motors Corp., 559 N.E.2d 732, 736 (Ohio 1990).  To prevail on an abuse of process claim, a plaintiff must show "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct

---

Sandusky, 68 Ohio St. 3d 139, 142-44 (1994), the Ohio Supreme Court rejected that view in Fabrey v. McDonald Village Police Dep't, 70 Ohio St. 3d 351, 354-55 (1994).

damage has resulted from the wrongful use of process." <u>Yaklevich v. Kemp, Schaeffer, & Rowe, Co.</u>, 626 N.E.2d 115, 116 (Ohio 1994).

The Court has already held that Cleveland is immune from liability with respect to these two claims under O.R.C. § 2744.03(A)(1).  Likewise, under Ohio common law, a prosecutor is absolutely immune from liability when carrying out his prosecutorial functions.  <u>Radvansky v. City of Olmsted Falls</u>, 395 F.3d 291, 316 n.21 (6th Cir. 2005) (<u>citing</u> <u>Willitzer v. McCloud</u>, 453 N.E.2d 693, 695 (Ohio 1983)).  Section 2744.03(A)(7) specifically preserves this common law right of prosecutorial immunity.  Accordingly, Prosecutor Watson is personally immune from liability with respect to these two claims.  <u>Id.</u>

The remaining question is whether Chief Lohn, the only other named defendant, can be held personally liable for malicious prosecution and abuse of process.  In Ohio, a police officer is immune from liability for malicious prosecution when he provides the prosecutor with "full and fair disclosure of all the material facts as revealed by his investigation, including . . . exculpatory statements."  <u>Radvansky</u>, 395 F.3d at 316-17 (<u>quoting</u> <u>Robbins v. Fry</u>, 594 N.E.2d 700, 701 (3d App. Dist. 1991)).  Thereafter, a police officer is relegated to the status of informant or witness.  <u>Id.</u>  Liability can only be reinstated if he "demonstrates a desire, direction, request, or pressure for the initiation of criminal proceedings."  <u>Id.</u> at 317 (<u>quoting</u> <u>Fry</u>, 594 N.E.2d at 702).  The Court concludes that this reasoning would likewise apply to an abuse of process claim.

Here, Lentz does not allege that Chief Lohn withheld any material facts from the prosecutor.  Moreover, he has not set forth any evidence to suggest that Chief Lohn expressed any desire, direction, or pressure for the initiation of criminal proceedings.  Although Chief Lohn signed off on the UDF investigation, almost every UDF investigation is forwarded to the

prosecutor's office for final review. (Draper Depo., at 66; Lohn Depo., at 93; Watson Depo., at 13-14.) Thereafter, Prosecutor Watson had <u>sole</u> <u>authority</u> to charge Lentz. Chief Lohn affirmatively stated that he never had any conversations with Prosecutor Watson regarding that decision. (Lohn Depo., 120.) Absent any evidence that Chief Lohn specifically requested or pressured Prosecutor Watson to charge Lentz, the Court concludes that he is immune from liability with respect to the malicious prosecution and abuse of process claims. <u>See</u> <u>Radvansky</u>, 395 F.3d at 17 (<u>quoting</u> <u>Fry</u>, 594 N.E.2d at 702)).

Because all of the Defendants are immune from liability, the motion for summary judgment, with respect to the malicious prosecution and abuse of process claims, is granted.

### G.    O.R.C. § 1347: Unlawful Disclosure Claim

Lentz argues that the alleged release of confidential medical records violated O.R.C. § 1347.10. Section 1347.10(A)(2) states in pertinent part:

> A person who is harmed by the use of personal information that relates to him and that is maintained in a personal information system may recover damages in civil action from any person who directly and proximately caused the harm by . . . intentionally using or disclosing the personal information in a manner prohibited by law.

A plaintiff must file within two years after the cause of action accrued or within six months after the wrongdoing is discovered, whichever is later. O.R.C. § 1347.10(A). "The cause of action accrues at the time that the wrongdoing occurs." <u>Id.</u>

The Defendants argue that Lentz did not comply with the statute of limitations. The Court agrees. Mr. Tobin stated that he received the psychological reports from a confidential informant some time in December of 2001. Thus, at the very latest, the alleged wrongdoing occurred on December 31, 2001. Lentz concedes that he became aware of the disclosure on

April 19, 2002, when Mr. Tobin published the information in the Cleveland Plain Dealer. (Docket No. 52, at 23.) Thus, according to § 1347.10(A), Lentz had until December 31, 2003 to file his suit, two years after the alleged wrongdoing occurred. Lentz argues that the alleged wrongdoing actually occurred on April 19, 2002, when Mr. Tobin published the information. However, Lentz is not suing Mr. Tobin, he is suing Cleveland. The evidence illustrates that if a Cleveland employee gave Mr. Tobin these medical records, this alleged wrongdoing occurred no later than December 31, 2001. Thus, Lentz had until December 31, 2003 to file suit. See O.R.C. § 1347.10(A). He did not do so, however, until March 22, 2004, eighty-one (81) days too late. Because he did not comply with the statute of limitations, the motion for summary judgment, with regard to the unlawful disclosure claim, is granted.

### H. Invasion of Privacy Claim

Lentz alleges that the release of his pre-employment psychological evaluations constituted an invasion of privacy. In Ohio, there are three types of invasion of privacy: "(1) the unwarranted appropriation or exploitation of one's personality; (2) the publicizing of one's private affairs with which the public has no legitimate concern; and (3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Sustin v. Fee, 69 Ohio St.2d 143, 145 (1982). To prevail on a claim for publicizing one's private affairs, a plaintiff must establish: (1) a public disclosure; (2) disclosure of facts concerning the private life of an individual; (3) publicizing of a matter that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) publication that is intentional; and (5) publication of a matter that is not a legitimate concern to the public. Killilea v. Sears, Robuck & Co., 499 N.E.2d 1291, 1294-95

-36-

(10th App. Dist. 1985).

The Defendants argue that they cannot be liable for an invasion of privacy claim because pre-employment psychological evaluations are not "medical records" under Ohio law and thus, are subject to public disclosure under O.R.C. § 149.43. Indeed, in State ex rel. Multimedia, Inc. v. Snowden, 72 Ohio St.3d 141, 145 (1995), the Ohio Supreme Court held that pre-employment psychological evaluations are not medical records because they are not sought in the process of medical treatment. Accordingly, the Ohio Supreme Court concluded that such records are subject to public disclosure under O.R.C. § 149.43. Id. However, Snowden is not dispositive in this case.[12] Although pre-employment examinations might not be considered medical records under O.R.C. § 149.43(A)(3), they are "confidential medical records" under the ADA. See 42 U.S.C. § 12112(d)(3)(B); Pollard v. City of Norwood, 161 F. Supp. 2d 782, 793 (N.D. Ohio 2001). A plaintiff need not show that he is disabled in order to enforce this ADA provision. See Cossette v. Minnesota Power & Light, 188 F.3d 964, 969 (10th Cir. 1999).

Under the Supremacy Clause, federal law can preempt state law in three circumstances. English v. General Elec. Co., 496 U.S. 72, 78 (1990). First, in cases of express preemption, Congress explicitly defines "the extent to which its enactments preempt state law." Id. Second, under field preemption, "state law is preempted where it regulates conduct in a field where Congress intended the Federal Government to occupy exclusively." Id. at 79. Third, under

---

[12]     It is also unclear whether Snowden remains good law in light of State ex. rel. Keller v. Cox, 85 Ohio St.3d 279 (Ohio 1999). In Keller, the Ohio Supreme Court held that police officer files that contain "medical information" are exempt from public disclosure. Id. at 282. Without addressing its holding in Snowden, the court reasoned that such disclosure would violate the police officer's constitutional right of privacy. Id.

conflict preemption, "state law is preempted to the extent that it actually conflicts with federal law." Id.

Conflict preemption applies in this case. The ADA defines pre-employment examinations as "confidential medical records." 42 U.S.C. § 12112(d)(3)(B). Medical records are explicitly excepted from public disclosure under Ohio law. See O.R.C. § 149.43(A)(1)(a). To the extent that Ohio law states that pre-employment examinations are not medical records and subject to public disclosure, it directly conflicts with the ADA. Thus, in this very case, the EEOC held that "to the extent that this [Ohio] statute requires the release of an employee's confidential medical records, it is in direct conflict with the requirements of the federal Americans with Disabilities Act, which is controlling." (Plaintiff's Ex. 30.) Because the ADA, which is controlling, redefines pre-employment examinations as "confidential medical records" and medical records are exempt from public disclosure under Ohio law, Lentz' pre-employment psychological evaluations are not subject to public disclosure. Moreover, Ohio law specifically excepts from public disclosure "[r]ecords the release of which is prohibited by state or federal law." See O.R.C. § 143(A)(1)(v). Accordingly, Lentz' pre-employment psychological evaluations are confidential medical records not subject to public disclosure.

The Defendants also argue that Lentz has not provided any evidence that a Cleveland employee released his confidential medical records. The Court defers a ruling on this claim because its resolution is dependent upon a pending motion to compel, which the Court has not yet had an opportunity to address. It will entertain a supplemental motion for summary judgment on this claim once discovery is completed.

-38-

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** with respect to the discrimination and § 1983 claims.  The Motion is **GRANTED** with respect to the retaliation, ADA, malicious prosecution, abuse of process, and unlawful disclosure claims.  The Court defers a ruling with respect to the invasion of privacy claim until discovery is completed.

**IT IS SO ORDERED.**


**Date: January 18, 2006**                                 _/s/ John M. Manos_____
                                                            **UNITED  STATES DISTRICT JUDGE**