# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **EDWARD P. LENTZ,** | : | |
|  | : | **Case No. 1:04cv669** |
| **Plaintiff,** | : | |
|  | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
|  | : | |
| **THE CITY OF CLEVELAND, et al.,** | : | <u>**OPINION & ORDER**</u> |
|  | : | |
| **Defendants.** | : | |

Before the Court is *Defendants' Rule 50 Motion for Judgment Notwithstanding the Verdict and Alternative Motions* (Doc. 175), in which the City of Cleveland ("the City"), its Safety Director, and its Chief of Police (collectively, "Defendants") ask the Court to enter post-verdict judgment in their favor as a matter of law.[1]  Alternatively, Defendants ask the Court for a new trial or, absent either judgment or a new trial, for a remittitur of the $800,000 judgment the jury awarded to Plaintiff Edward Lentz ("Lentz").  Also before the Court is *Plaintiff's Motion for Prejudgment and Post-Judgment Interest* (Doc. 174).  For the reasons outlined below, the Court finds that Defendants are not entitled to: (1) judgment as a matter of law; (2) a new trial; or (3) remittitur.  Accordingly, the Court **DENIES** Defendants' motion, and finds that the jury's verdict (Doc. 166) and the Court's

---

[1] Defendants refer to their motion as a "motion for judgment notwithstanding the verdict." In 1991, however, Federal Rule 50 was amended and the terminology was changed to refer to this motion as a renewed motion for judgment as a matter of law.  *See* Fed. R. Civ. P. 50 advisory committee's note (1991 amendment); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 786 n.1 (6th Cir. 2005) (noting change).  The Court, therefore, refers to this motion using the current language of Rule 50.

judgment (Doc. 167) stand.  In addition, the Court finds that Plaintiff is entitled to post-judgment, but not prejudgment interest.  Accordingly the Court **GRANTS in part** and **DENIES in part** Plaintiff's motion.

## I.     BACKGROUND

By way of introduction, the Court briefly summarizes the events and allegations that led to the trial in this case.  The following is only a summary, however.  Additional evidence presented and legal determinations made during the trial are also discussed, as necessary, in the discussion section of this Opinion and Order.  The Court, moreover, refers to the detailed trial record, which cannot be fully repeated in this order, to support its conclusions.

Plaintiff Edward Lentz is a Cleveland police officer.  This lawsuit arises from the City's response to, and investigation of, Lentz's non-fatal shooting of a suspect while on duty.  Specifically, as it relates to the claims that ultimately went to trial in this case, Lentz alleges that he was the subject of reverse discrimination (he is white) and unlawful retaliation (1) when he was assigned to police gymnasium duty for 652 days pending the investigation of the shooting, and (2) when the Police Department brought departmental charges against him relating to his actions during the shooting.

The shooting incident occurred on December 6, 2001, while Lentz was assigned to guard the home of then-Mayor-elect Jane Campbell.  At 8:30 a.m. that day, Lentz noticed a blue station wagon come to a quick halt after driving down the street on which he was parked.  As Lentz stepped out of his own vehicle and approached the station wagon, the station wagon backed away.  He ordered the driver to stop, but the vehicle backed up, hit a tree, and drove toward Lentz.  There are disputes as to the events that followed, but, at some point, Lentz ended up on the roof of the vehicle.  For

2

instance, while Lentz testified that the vehicle struck him, and that his arm was caught in the luggage rack, forcing him to pull himself up onto the vehicle to avoid being dragged, Defendants presented evidence of some witness statements indicating that Lentz grabbed onto the vehicle of his own free will.  There are also disputes as to how fast the station wagon was going, both at that time the vehicle approached Lentz and after Lentz found himself on the roof.

With Lentz on the roof, the station wagon headed toward a busy intersection.  According to Lentz, in an effort to stop the vehicle, for his safety and the safety of others in the intersection, Lentz shot fourteen rounds through the roof of the vehicle, hitting the driver.  The vehicle continued through the intersection and crashed into a yard.  After Lentz commanded both occupants, a driver and a passenger, out of the vehicle, he determined that the driver was struck and called for backup and an ambulance.  It was later determined that the driver of the vehicle was Lorenzo Locklear, a 12 year-old African American male.  He had stolen the vehicle and had illegal drugs in his possession. His wounds were non-fatal.  The passenger, a 14 year-old African American male, was not harmed.

Immediately following the incident and pursuant to departmental policy, Lentz was given an automatic three-day administrative leave.  Thereafter, and also pursuant to departmental policy, he was assigned to police gymnasium duty pending an investigation by the Use-of-Deadly-Force ("UDF") investigation team.  Also immediately following the incident, on December 7, 2001, members of the local media made a public records request regarding the incident.  Lentz believed that the Police Depart responded to the request by releasing, among others, his confidential personnel file, including his medical records.  Based on this belief, Lentz filed a grievance on December 21, 2001, alleging that the Police Department violated its collective bargaining agreement with the Cleveland Police Patrolmen's Association ("CPPA").  On January 8, 2002, then-Chief of Police

3

Mary Bounds denied the grievance.

On February 6, 2002, the UDF investigation team completed its investigation and sent its report to First Assistant Prosecutor Edward Buelow, who was acting prosecutor in the absence of a chief prosecutor at that time.  On March 11, 2002, Buelow submitted the case to a grand jury. However, in April 2002, Lieutenant Robert Klimak of Internal Affairs requested the file back to re-interview witnesses and canvass the neighborhood.

While Lt. Klimak was conducting the reinvestigation, on April 19, 2002, the Cleveland Plain Dealer published a newspaper article about the shooting which referenced certain psychological information about Lentz.  Specifically, the article referenced Lentz's pre-employment psychological evaluations conducted by the City, evaluations which would have been in Lentz's personnel file. On July 17, 2002, Lentz filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") against the City for unlawful disclosure of medical records in violation of the Americans with Disabilities Act ("ADA").  On September 5, 2002, the EEOC issued a determination that Cleveland violated the ADA and, later, issued a right to sue letter.

Thereafter, in October 2002, Lt. Klimak resubmitted the UDF investigation report to Chief Prosecutor Sanford Watson.  Rather than return directly to the grand jury, on February 5, 2003, Prosecutor Watson charged Lentz charged with felonious assault and a misdemeanor charge for providing false information to the UDF investigation team regarding the events leading up to the shooting.  The matter was then resubmitted to the grand jury and, on April 2, 2003, the grand jury returned an indictment on the misdemeanor falsification charge, but not on the felonious assault charge.  On July 27, 2003, after the state presented its case, the Cuyahoga County Court of Common Pleas judge dismissed the misdemeanor charge on a motion for acquittal pursuant to Rule 29 of the

4

Ohio Rules of Criminal Procedure.  The judge reasoned that the state's witnesses either had an obstructed view of the incident, rendering their testimony unreliable, or that their testimony tended to support the notion that the vehicle had, in fact, struck Lentz.

On August 29, 2003, the Police Department filed departmental charges against Lentz for (1) violating the "use of force" policy, (2) alleging untruthful accounts of the shooting incident, and (3) "failing to notify" dispatch before he approached the vehicle.  On September 4, 2003, Lentz entered a plea of no contest to the "failure to notify" charge and the Police Department dismissed the other charges.[2]  On September 8, 2004, he received a 3-day administrative leave.  On September 17, 2003, he was reinstated and received back pay.  In total, he spent 652 days on gymnasium duty.

On March 22, 2004, Lentz filed this lawsuit in the Cuyahoga County Court of Common Pleas, and Defendants removed the case to this Court on April 8, 2004.  In his Complaint, Lentz alleged reverse discrimination, retaliation, malicious prosecution, abuse of process, invasion of privacy, and unlawful disclosure of records in violation of the ADA.  The Court granted partial summary judgment to Defendants on several of Lentz's claims, and only the following claims proceeded to trial: a claim for discrimination under O.R.C. § 4112 and 42 U.S.C. §§ 1981, 1983, and

─────────────────

[2]  While Lentz did not dispute that he technically failed to notify the dispatch of certain of his actions as the events unfolded, substantial evidence was submitted at trial indicating that any such failure was the result of radio malfunctions which interfered with Lentz's efforts to remain in contact with dispatch.

a claim for retaliation under O.R.C. § 4112 and 42 U.S.C. §§ 1981, 1983.[3]

On January 26, 2007, following a seven day jury trial, a jury found that Lentz was the subject of unlawful discrimination and retaliation, and that the City was liable for both actions.  On January 30, 2007, the Court entered judgment on the verdict.  Defendants then filed the present motion for judgment notwithstanding the verdict, for a new trial, or for an amended judgment.  The Court now turns to that motion.

## II.    MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

Defendants do not differentiate which of their arguments are directed toward their motion for judgment as a matter of law and which are directed toward their motion for a new trial.  The Court treats all of Defendants arguments as directed toward both motions and, accordingly, discusses them together.

### A.    Legal Standards

Federal Rule 50(b) governs post-verdict motions for judgment as a matter of law.  A motion under Rule 50(b) "may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party."  *Gray v. Toshiba America Consumer Products, Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citing *K&T Enters., Inc. v. Zurich Ins. Co.*, 97

---

[3]  After initially granting judgment for Defendants on Lentz's retaliation claim in its entirety, the Court reinstated that claim, in part, as it related to the alleged adverse actions of gymnasium duty and the filing of departmental charges.  (Doc. 94).  The Court reasoned that "these two issues rely on the same evidence used to support the existing reverse discrimination claim, evidence of which raises triable issues of material fact.  There is, therefore, little prejudice to the Defendants from trying these issues in one proceeding and less likelihood of reversal based on having imposed a burden on Plaintiff which is arguably too stringent at this stage of the proceedings."  (*Id.*)

F.3d 171, 175-75 (6th Cir. 1996)). Put another way, "sufficient evidence for submission to the jury will be found 'unless, when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issue of fact upon which a reasonable person could differ.'" *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 157 (6th Cir. 1997) (quoting *Monette v. AM-7-7 Baking Co., Ltd.*, 929 F.2d 276, 280 (6th Cir. 1991)).

For a moving party to succeed on such a motion, it "must overcome the substantial deference owed a jury verdict." *Radvansky v. City of Olmsted Falls*, --- F.3d ---, 2007 WL 2141379, *3 (6th Cir. July 27, 2007). The Court is not free to weigh the parties' evidence or to pass upon the credibility of witnesses. *Black v. Zaring Homes*, 104 F.3d 822, 825 (6th Cir. 1997); *K & T Enters.*, 97 F.3d at 175. Nor may the Court substitute its own judgment for that of the jury. *Zaring Homes*, 104 F.3d at 825; *K & T Enters.*, 97 F.3d at 175-76. Instead, the Court must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the record. *Zaring Homes*, 104 F.3d at 825; *K & T Enters.*, 104 F.3d at 176.

Defendants' alternative motion for a new trial is governed by Federal Rule 59(a). In contrast to judgment as a matter of law, "[t]he authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court." *Williamson v. Owens-Illinois, Inc.*, 787 F.2d 594, 1986 WL 16533 at *3 (6th Cir. 1986) (quoting 11 Wright & Miller, Federal Practice and Procedure, §2806 (1973)). When reviewing a motion for a new trial, a court "should indulge all presumptions in favor of the validity of the jury's verdict." *Brooks v. Toyotomi Co.*, 86 F.3d 582, 588 (6th Cir. 1996) (citing *Ragnar Benson, Inc. v. Kassab*, 325 F.2d 591, 594 (3rd Cir. 1963)). A jury verdict must be upheld so long as there is any competent and substantial evidence in the record

to support it, even if contradictory evidence was presented.  *Green v. Francis*, 705 F.2d 846, 849 (6th Cir. 1983).  The simple fact that "the grant of a new trial might result in a different outcome is not a valid ground for disturbing a jury's verdict which is otherwise based upon legally sufficient evidence."  *Brooks*, 86 F.3d at 588 (citation omitted).

> **B.     Discussion**

In support of their motion for judgment as a matter of law or, alternatively, for a new trial, Defendants organize their challenges into three broad arguments: (1) there was insufficient evidence to support Plaintiff's discrimination claim; (2) there was insufficient evidence to support Plaintiff's retaliation claim; and (3) the Court's rulings on certain motions in limine improperly affected the presentation of evidence.  With respect to their challenges to the sufficiency of the evidence for the discrimination claim and retaliation claim, Defendants organize their arguments by addressing each element of those claims, as well as by addressing the evidence required for municipal liability for each claim.  For the sake of consistency, the Court uses the same organization for its opinion.

As an initial matter, however, although not raised by Plaintiff, the Court notes that Defendants might be precluded from raising some of their instant arguments in support of their Rule 50 motion because they failed to raise those arguments in their Rule 50(a) pre-verdict motion for judgment as a matter of law, made orally at trial.  (Trial Transcript ("Tr.") at 849-868).  As the advisory committee's notes to Rule 50 make clear, "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50 advisory committee's note (1991 amendment); *see also Kusens v. Pascal Co., Inc.*, 448 F.3d 339, 361 (6th Cir. 2006) ("A post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion." (citing *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997))).

It is also true, though, that "technical precision is not required" when a party lays out its grounds for judgment in a Rule 50(a) motion, and a Rule 50(a) motion should not be read narrowly. *Kusens*, 448 F.3d at 361. In addition, the purpose of a Rule 50(a) motion is to put the Court and the opposing party on notice of any deficiencies in the opposing parties case, and, where that purpose is met, courts take a "liberal view" of what grounds in a pre-verdict motion will support a post-trial motion. *Id.*

In this case, there are several arguments advanced by Defendants in their present motion that are not supported by their pre-verdict motion. With respect to Lentz's discrimination claim, Defendants only argued in their pre-verdict motion that Lentz's claim failed because there was no evidence of similarly situated employees who were treated differently, and because Plaintiff did not demonstrate that the legitimate, non-discriminatory reasons proffered by Defendants were pretextual. Defendants did not argue at any time during their pre-verdict motion, as they do now, that the gymnasium duty and the departmental charges were not adverse employment actions or materially adverse actions.[4] With respect to Plaintiff's retaliation claim, Defendants only argued in their pre-verdict motion that the decision-makers were not aware that Lentz had engaged in protected activity, and that Plaintiff had not shown that Defendants' proffered legitimate, non-discriminatory reasons were pretextual. Defendants did not argue at any time during their pre-verdict motion, as they do now, that there was no causal connection between Plaintiff's protected activity and the allegedly retaliatory actions.

The Court, therefore, could preclude Defendants from arguing in these motions that the

---

[4] While Defendants did object to the Court's jury instruction on that issue, they did not include that argument in their Rule 50(a) motion.

9

gymnasium duty and the departmental charges were not adverse employment actions, and that there was no causal connection between Lentz engaging in a protected activity and the allegedly adverse actions. Because the Court ultimately concludes that these arguments do not warrant the relief Defendants seek, however, it does not reach the question of whether Defendants should be barred from raising them now. It notes only the unsteady ground on which Defendants stand in making certain Rule 50 arguments. With that in mind, the Court now turns to Defendants' arguments.

### 1.    Discrimination Claim

The evidentiary standards that apply to Plaintiff's claim for intentional discrimination under O.R.C. § 4112 and 42 U.S.C. § 1981 mirror the standards that apply to a claim for discrimination under Title VII. *Little Forest Medical Ctr. of Akron v. Ohio Civ. Rights Comm'n*, 61 Ohio St.3d 607, 609 (1991). That is, the Court must apply the *McDonnell Douglas* framework, which first requires a plaintiff to establish a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). To make out a *prima facie* case of discrimination, a plaintiff must establish that: (1) he is a member of a protected group; (2) he was qualified for the position; (3) he was subject to an adverse employment decision; and (4) he was treated differently than similarly situated non-protected employees.[5] *Newman v. Federal Exp.*

---

[5]  The Sixth Circuit has modified this test where, as here, a plaintiff claims that he was the subject of reverse discrimination. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). In those circumstances, "to satisfy the first prong of the prima facie case, the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (internal quotation and citation omitted). In their present motion, Defendants do not challenge the sufficiency of the evidence as to the first prong of this modified test - i.e., they do not argue that Plaintiff failed to demonstrate that background circumstances indicate that the City is that unusual employer that discriminates against the majority. Defendants, therefore, have waived this argument for purposes of these post-trial motions.

*Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).  Once the plaintiff establishes a *prima facie* case for a discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *Talley*, 61 F.3d at 1246.  The ultimate burden of persuasion always remains with the plaintiff.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

In this case, the only element of the *prima facie* case that Defendants do not challenge is that Lentz was qualified; they attack the sufficiency of the evidence for the remaining elements of a *prima facie* case as well as the evidence that their proffered reasons for their actions were mere pretext.

### a.    Member of a Protected Group

Defendants argue that Plaintiff never put into evidence that he is white, and that mere jury observation of Plaintiff in the courtroom is insufficient to establish that fact.  Regardless of whether jury observation is sufficient, witness testimony referred to Plaintiff's race, (Tr. at 889), and certain exhibits admitted into evidence indicate that Plaintiff is white (*see, e.g.,* Plaintiff's Exhibits ("Pl. Ex.") 13, 67).  Accordingly, Plaintiff has presented sufficient evidence of his race for purposes of his reverse discrimination claim.

### b.    Adverse Employment Action

Defendants next argue that Plaintiff did not present sufficient evidence that his gymnasium duty and departmental charges constituted adverse employment actions, and that the Court erred in

11

instructing the jury that those events did constitute adverse employment actions as a matter of law.[6]

Defendants argue that Lentz's gymnasium duty in this case is akin to the paid administrative leave

that the Sixth Circuit has found <u>not</u> to be an adverse employment action in other cases.  *See, e.g.,*

*Dedinger v. State of Ohio*, 2006 WL 3311284 (6th Cir. Nov. 14, 2006) (citing *Peltier v. United*

*States*, 388 F.3d 984, 988 (6th Cir. 2004)).  In addition, Defendants contend that certain witnesses

testified that gymnasium duty was not a bad experience.  As to the departmental charges, Defendants

argue that these charges flow automatically when criminal charges are brought against an officer,

and that the threat of discipline does not constitute an adverse employment action.

As an initial matter, the Court reiterates that Defendants did not raise these arguments in their

pre-verdict motions made at trial.  To the extent that Defendants' earlier failure bars them from

raising these arguments now, these arguments can be rejected on that ground alone.  In addition, the

Court already ruled in this case, in the context of Defendants' motion for summary judgment, that

these actions <u>do</u> constitute adverse employment actions as a matter of law.  *See Lentz v. City of*

*Cleveland*, 410 F.Supp.2d 673, 686 (N.D. Ohio 2006) (Manos, J.) ("Thus, given (1) the loss [of]

opportunities for overtime and secondary employment, (2) the significant differences between gym

duty and active duty, (3) the uniqueness of police work rendering this reassignment particularly

---

[6]  Notably, to the Defendants' benefit, the Court did not instruct the jury that the criminal charges brought against Lentz were adverse employment actions.  Plaintiff's challenge that decision as error, pointing out that the Court's summary judgment opinion in this case (issued by a previously-assigned judicial officer) alluded to the fact that those charges constituted adverse actions.  *See Lentz v. City of Cleveland*, 410 F.Supp.2d 673, 689 (N.D. Ohio 2006) (Manos, J.) ("[T]he Court concludes that [Lentz] has set forth sufficient evidence so that a reasonable jury could conclude that his prolonged detail to gym duty and the filing of <u>criminal</u> and departmental charges were all based upon his race to alleviate public concern and thus, discriminatory." (emphasis added)).  For the reasons stated during the final pretrial in this matter, (Transcript from 1/11/07 Final Pretrial ("Final Pretrial Tr.") at 42-45), however, the Court stands by its ruling.

undesirable, (4) the fact that officers do not like gym duty; and (5) the length of the investigation; the Court concludes that an almost two-year reassignment to gym duty pending an investigation constitutes an adverse employment action.").  As to the departmental charges, the Court also stated that the pursuit of those charges <u>after</u> the criminal charges were dropped might lead a reasonable jury to conclude that the charges were motivated by discriminatory intent.  *Id.* at 689.

In addition, the Court again, during the jury instruction conference with the attorneys, reiterated its conclusion that the gymnasium duty and the departmental charges constituted adverse employment actions.  (Tr. at 1261-62).  As the Court explained, this conclusion was independent of its earlier finding in the summary judgment context, and was based on the evidence presented during trial, including <u>substantial</u> testimony that gymnasium duty was dirty, dismal, and prevented officers from earning overtime and engaging in secondary employment.  (*Id.*)  Indeed, despite Defendants' current contention, there was really no credible evidence to the contrary on this point.  The Court also explained that its conclusion was based on the unique circumstances of this case, including the length of the gymnasium duty at issue here and the effects of such an extended assignment.  (Tr. at 1262).  Having so found, the Court does not see a reason to change its decision, and Defendants have not presented any compelling argument to do so.

First, Defendants' argument that paid administrative leave does not constitute an adverse employment action is not persuasive given the circumstances of this case.  This Court already rejected that argument, finding that the gymnasium duty in this case is distinguishable from the paid administrative leave the Sixth Circuit previously has found not to be actionable.  *See Lentz*, 410 F.Supp.2d at 685 (citing the loss of opportunity, difference in responsibilities, and unique nature of police work).  In addition, the case law on which Defendants rely specifically states that "a

13

suspension with pay and full benefits pending a <u>timely</u> investigation into suspected wrongdoing is not an adverse employment action." *Peltier*, 388 F.3d at 988 (emphasis added). In this case, the twenty-month investigation cannot be characterized as timely. Indeed, the twenty-month investigation in this case is far longer than the five-month investigation in *Peltier* or the three-month investigation in *Dendinger*. *See Peltier*, 388 F.3d at 986; *Dendinger*, 2006 WL 3311284 at *2. Indeed, testimony at trial indicated that the length of this investigation fell far outside the norm for such inquiries, and was actually the longest in departmental history. For that reason, Defendants' reliance on those cases is of no avail.

In addition, to the extent that the filing of departmental charges extended Lentz's gymnasium duty, the filing of those charges are intertwined with the gymnasium duty. The departmental charges, therefore, go beyond mere <u>threats</u> of discipline. Although Defendants contend that departmental charges automatically result from the filing of criminal charges (a point that will be discussed below), that explanation, even if true, does not account for the fact that Lt. Klimak requested, and Director Draper ratified, amended departmental charges <u>after</u> the criminal charges against Lentz were no longer pending - i.e., after the criminal charges were either no-billed by a grand jury or dismissed by a state court judge. Indeed, Lentz remained in the gymnasium for almost two months after the state court judge dismissed the final criminal charge on July 27, 2003. In addition, the request for amended departmental charges included a charge for failing to notify dispatch, a charge that previously had not been levied against Lentz. Given those facts, it is clear that the departmental charges also constitute an adverse employment action for purposes of Lentz's discrimination claim.

The Court, therefore, must reject Defendants' contention that, as a matter of law, the twenty-

14

month gymnasium assignment and departmental charges were not adverse employment actions.[7]

### c.  Similarly Situated Employees

Next, Defendants argue that Plaintiff failed to present sufficient evidence that similarly situated African-American officers were treated differently.  Specifically, Defendants argue that the African-American officers offered for comparison by Plaintiff are not similarly situated because: (1) the facts of each of their use of force incidents were different than Lentz's incident; (2) the investigation of each incident did not reveal inconsistent statements between the officer and the witnesses, as occurred in Lentz's case; (3) the relevant decision-makers in the other officers' use of force incidents were different than those in Lentz's case; and (4) the standards and policies of the City have changed.[8]

During the course of the trial, Plaintiff called as witnesses four African-American Cleveland police officers and presented the UDF files of three other African-American Cleveland police officers, all of who had been involved in shootings.  Most of the shootings involved suspects in cars, and some involved instances where the officer had been caught on the suspect's car and dragged.  These shootings all occurred between 1997 and 2002, and the length of these officers' gymnasium duty ranged from 95 days to 254 days.  Lentz's shooting occurred in 2001, and his gymnasium duty

---

[7] Defendants also argue under the "adverse employment action" element that the jury may have been misled into thinking that the criminal charges against Lentz constituted an adverse employment action, despite the Court's repeated instructions that the gymnasium duty and departmental charges were the <u>only</u> adverse actions in this case.  The Court addresses this argument in the section of the opinion dealing with Defendants' complaints about the Court's evidentiary rulings.

[8] In addition, Defendants also argue that Plaintiff failed to put into evidence the race of the African-American officers he claims were similarly situated.  Because certain exhibits contain that information, *see, e.g.,* Pl. Ex. 67, the Court also rejects that argument.

15

lasted 652 days.

Defendants' primary contention is that these officers were not similarly situated to Lentz because Lentz's incident was more complicated, in that there were more witnesses, there were differing witness accounts, and Lentz fired fourteen shots (compared to the next highest number of shots fired by the proffered comparable officers, six).  In addition, Defendants argue that only one officer's shooting occurred during the terms of Safety Director James Draper and Chief of Police Edward Lohn, who were in office during part of Lentz's gymnasium duty.[9]  For the reasons that follow, the Court does not find that Defendants' arguments warrant upsetting the jury's verdict in this case.

Generally, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Riggs v. Airtran Airways, Inc.*, --- F.3d ----, 2007 WL 2258826, at *6 (10th Cir. Aug. 8, 2007) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (same).  In this case, the jury was instructed clearly that "what the plaintiff must show is that he was treated adversely because of his race; i.e., that he was treated differently than other, similarly situated non-white officers."  (Jury Instructions, Doc. 164 at 23; Tr. at 1365) (emphasis added).[10]  Although the Court recognizes that Lentz's incident was not identical to the incidents of the seven officers that Plaintiff offers as comparables, the law does not require an exact correlation.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352

---

[9] As to Defendants' contention that a change in City policies renders these officers not similarly situated, the Court does not consider this argument because Defendants do not identify what standards or policies of the City have changed, or what effect any changes have had.

[10] At the jury charge conference, Defendants did not object to this instruction or request any further instruction on this point.  (Tr. at 1269-70).

(6th Cir. 1998).  They need only be similar in all <u>relevant</u> aspects.  *Id.*  As the Court recognized when it denied Defendants' motion for summary judgment on this point, "no shooting incident between an officer and a citizen will ever be exactly similar and [] some investigations may take longer than others."  *Lentz*, 410 F.Supp.2d at 686.  As indicated above, many of the comparable officers put forward by Lentz were involved in incidents with suspects in cars, and, in two cases, in incidents where officers were dragged by the suspect's vehicle.  The longest gymnasium duty any of the other officers received was 254 days, compared to Lentz's 652 days.  A careful review of the testimony of each of these officers reveals sufficient similarities between the events and the investigative processes employed, to justify allowing a properly instructed jury to assess whether the officers were, indeed, "similarly situated."[11]

In addition, the Court is not persuaded that the fact that there may have been different office-holders during certain of the relevant shooting incidents mandates upsetting the jury's decision.  First, one officer's shooting incident did occur while Director Draper and Chief Lohn were in office.  That officer spent 254 days in the gymnasium, less than half the time Lentz spent in the gymnasium.  In addition, the concerns over racial tension that Lentz alleges motivated his treatment by the City would have been present in the few years preceding his incident.  Indeed, the jury heard testimony from Director Draper himself that the 2001 mayoral election emphasized that Cleveland was a city "with deep racial divides."  (Tr. at 706).  A jury could conclude that these racial divides did not appear for the first time in 2001, but existed in prior years as well.  The identity of individual office-holders, therefore, is less relevant than the concerns present at the time, a fact the jury was entitled

---

[11]  Defendants' arguments on this point, taken to their logical conclusion, would mean that <u>no</u> officer could ever bring an action for discrimination in connection with his treatment after such an incident.  The Court declines to endorse such an extreme result.

17

to conclude based on the evidence.

It is significant, moreover, that these office-holders all acted pursuant to long-standing municipal policies governing responses to incidents such as those described by the various officers, and pursuant to a well-established decision-making chain of command.  Supervisory differences between the officers are far less important in such a military-type hierarchy than they would be in a standard private-employer context.

The question of whether these officers were similarly situated, therefore, was an issue for which there was clearly enough of a dispute to require submission of that question to the jury, subject to the clear jury instructions given.  Those instructions were that, "what the plaintiff must show is that he was treated adversely because of his race; i.e., that he was treated differently than other, similarly situated non-white officers."  (Jury Instructions, Doc. 164 at 23; Tr. at 1365)  Given the evidence, it cannot be said that, "viewing the evidence in the light most favorable to [Lentz], there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of [Defendants]." *Gray*, 263 at 598.  Accordingly, the Court rejects Defendants' argument that it is entitled to judgment as a matter of law based on this issue.

### d. Pretext

Once the plaintiff establishes a *prima facie* case for a discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *Talley*, 61 F.3d at 1246.  In this case, Defendants offered the following reasons for Plaintiff's gymnasium stay: (1) it was standard procedure to keep an officer in the gymnasium for the length of the investigation and final disposition by the prosecutor; (2) Lt. Klimak

18

took back the file because he believed it was not fully investigated; (3) there was no chief prosecutor until October 2002; (4) the chief prosecutor came to an office that had a back log of use of deadly force and internal affairs cases; (5) the prosecutor evaluated cases based on whether there was a statute of limitations and prioritized use of deadly force cases by fatalities first; and (6) both Prosecutor Buelow and Watson determined that there was probable cause to charge Plaintiff criminally.  As to the departmental charges, Defendants contend that such charges are automatically filed when criminal charges are issued, and that amendment of departmental charges is permitted.

The proffer of these legitimate, non-discriminatory reasons shifts the burden to Plaintiff to establish that they are mere pretext for discriminatory motives.  Plaintiff can meet his burden if he can show that the reasons: (1) have no basis in fact; (2) did not actually motivate the challenged conduct; or (3) are insufficient to explain the challenged conduct.  *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).  Plaintiff argues that the asserted justifications have no basis in fact or are not sufficient to warrant the actions taken by Defendants because the initial investigation was completed in only three months, which the evidence showed was the standard practice, and the reinvestigation was just a "mock" investigation that served no legitimate purpose, as evidenced by the fact that it revealed only one previously unidentified witness.

As to Lt. Klimak's decision to take back Lentz's UDF file, the jury was presented with the following evidence.  The initial investigation, conducted by Lt. Joseph Petkac, was completed in three months and submitted to the prosecutor's office. Lt. Petkac testified that there was a ninety-day limitation on investigations generally, and that any extension beyond that time would have to be requested. (Tr. at 546-548). Lt. Petkac also testified that, when he sends a file to the prosecutor's office, he is "comfortable" and "confident" that it is complete. (Tr. at 549.) The assistant prosecutor

19

at the time, Edward Buelow, received the file and, after one month, submitted criminal charges to the grand jury.  Buelow testified that he believed the file was sufficient to support submission of a case to a grand jury, and that he had some additional questions about the file answered before submitting the case to the grand jury.  (Tr. at 590).

The jury also heard Lt. Klimak testify that he had never before taken a file back after it had been submitted to the grand jury.  (Tr. at 605).  He also stated that, prior to taking the file back, he never indicated to anyone that he had any questions about the investigation.  (Tr. at 651).  Lt. Klimak's re-investigation lasted six months, but he only interviewed one new witness that had not been interviewed during Lt. Petkac's investigation; all of the remaining witnesses but one had been interviewed by the original team within 72 hours of the shooting incident in the original investigation.  When given a chance to explain why he took Lentz's UDF file back, Lt. Klimak's only explanation was that it was not investigated to his satisfaction, and he wanted to take a "closer look" at certain aspects of the case.  (Tr. at 978).  After Lt. Klimak took the case back from the grand jury, it was not resubmitted to a grand jury until almost ten months later, with Lentz all the while continuing on gymnasium duty.  Given these circumstances, a jury could conclude that this explanation either was simply not true or that it was insufficient to explain the alleged conduct.

In addition, the jury heard circumstantial evidence from which it could have concluded that Defendants were motivated by Plaintiff's race when they took the adverse actions in this case.  For example, the jury heard that, based on certain data compilations comparing the length of gymnasium duty officers received pending a UDF investigation, the five officers who received the longest periods of gymnasium time were white officers involved in the shootings of black suspects.  (Tr. at 889-96).  The jury also heard evidence that Director Draper talked to Chief Lohn about six pending

20

investigations of police shootings, including Lentz's case.  Draper testified that he told Chief Lohn that these cases needed to be handled with care to avoid civil unrest and, potentially, riots, as had occurred recently in Cincinnati following a police shooting.  (Tr. at 715-17).  In addition, Draper stated that he met with the Cleveland NAACP President George Forbes, who told Draper that members of the NAACP were concerned about the police shootings.  (Tr. at 713).  Draper also testified that he and Chief Lohn attended a City council hearing in which the recent police shootings were discussed, including where Lentz's case "certainly was mentioned in the context of the incidents." (Tr. at 722).  Draper also testified that he had bi-weekly meetings with Mayor Campbell and Chief Lohn regarding the police shootings.  (Tr. at 714).  Further, there was testimony that Chief Lohn was aware that Klimak had taken back the investigation (Tr. at 669-70), and testimony that Klimak had brief conversations with Chief Lohn while he was conducting the reinvestigation (Tr. at 642).

In addition to evidence that these decisionmakers had discussions about Lentz's case, the jury also heard evidence about the high-profile nature of this case.  First, the shooting itself occurred outside of the Mayor-elect's house.  Mayor Campbell, who was in office during the pendency of Lentz's gymnasium duty, clearly was aware of and familiar with the incident.  Second, Plaintiff offered into evidence numerous news accounts - including a summary of fifty television new clips - about Lentz's shooting and subsequent investigation.  In one article, Mayor Michael White personally discussed Lentz's shooting incident and the investigation into that incident.  (Ex. 29; Tr. at 102-03).  Finally, the shooting involved a twelve-year old suspect which, by itself, may have garnered attention even aside from the other factors.  Based on this evidence, a reasonable jury could have inferred that Lentz's case was so high-profile that Mayor Campbell, Director Draper, Chief

21

Lohn, and Lt. Klimak had it on the forefront of their thoughts and discussions, including their discussions about racial concerns.  And, the jury could have inferred that these officials made a conscious decision to delay any resolutions of the matter in hopes that the emotions surrounding it would lessen over time.

As to the departmental charges, Defendants argue again that these charges are filed automatically when criminal charges issue, and that amendment of the departmental charges is permitted.  First, in support of their contention that departmental charges are "automatically" filed, Defendants cite to a portion of the transcript in which Lt. Klimak merely states that, once criminal charges issue, the Safety Director has to determine an officer's status.  (Tr. at 1009).  Indeed, although Lt. Klimak stated that departmental charges "flow after" criminal charges, the process he described consists of him having to request charges, the Chief having to approve the request, and the Safety Director issuing a charging letter and holding a hearing on the charges.  (Tr. at 1010).  This is hardly the automatic process Defendants claim that it is.  Indeed, the relevant collective bargaining agreement provides for a special procedure "in the event that" administrative charges are brought that are based on the same circumstances that give rise to criminal charges, indicating that it is possible, but not automatic, that such a situation could arise.  (Def. Ex. 1053 at p. 59, ¶ 71) (emphasis added).

Second, even if the jury concluded that departmental charges normally would flow automatically from criminal charges, the jury could question the propriety of following that practice in this case, where the grand jury ultimately did not indict on the key charges initially brought.

Third, simply because an amended departmental charge is permitted does not mean it was brought for a legitimate purpose.  As noted above, *supra* Part II.B.1.b, Lt. Klimak requested, and

Director Draper ratified, amended departmental charges <u>after</u> all criminal charges against Lentz were no longer pending. These amended charges included, moreover, a charge for failing to notify dispatch, a charge that previously had not been levied against Lentz. A reasonable jury could question the true intent of these actions.

Viewing the evidence in Lentz's favor, as the Court must, the Court concludes that reasonable minds could reach a conclusion other than the one Defendants urge. The investigation of Lentz's shooting incident was completed, sent to the prosecutor, and submitted to a grand jury. The evidence indicated that both the original investigator and prosecutor considered the case to be sufficiently complete. Lt. Klimak justified his decision to take the file back and reinvestigate, the first time he had ever done so after a UDF file has gone to the prosecutor's office, by citing only his subjective belief that the case was not fully investigated. This decision led to a six month investigation followed by a four month delay before the case was again submitted to the grand jury, and Lt. Klimak did not dispute that it took him four months to even start canvassing for witnesses. He explained the delay both by saying he was busy with other cases (Tr. at 614) and that he wanted to make sure he was thorough (Tr. at 648-49), explanations which are, on their face, somewhat inconsistent. It is reasonable for the jury to have concluded that, given the unusual and unprecedented circumstances of this case, Lt. Klimak's espoused subjective belief that the file needed more investigation did not actually motivate his decision to take back the file after it had been submitted to the grand jury.[12] This is particularly true, moreover, when one keeps in mind that

---

[12] In addition, although Defendants' third, fourth, and fifth proffered justifications pertain to the four-month delay between Lt. Klimak's submission of his re-investigation to the prosecutor and the ultimate issuance of criminal charges, this is only a four-month period out of the nearly two years Lentz spent in gymnasium duty. Even if a jury accepted these justifications, a reasonable jury could still find liability based on the remaining delays.

it was the jury who was charged with making all relevant credibility determinations in this case, leaving them free to disbelieve any portions of Lt. Klimak's proffered explanations for his conduct.

The Court clearly instructed the jury as to Plaintiff's burden of demonstrating that Defendants' proffered justifications were mere pretext. Indeed, the jury instructions even explained that "Lentz must show both that the explanation is false and that discrimination was the real reason the defendant took adverse actions against him." (Doc. 164 at 25; Tr. at 1367). The Court, moreover, expressly included an instruction, not even requested by Defendants, to avoid any possibility that the jury would find in favor of Lentz simply because they believed he was the victim of "racial politics" or "political motivations." The jury was clearly instructed that:

> You should understand that the issue in this case is not whether the plaintiff, as a general matter, was the victim of racial politics or whether he or other officers may have been treated unfairly for "political reasons." Instead, what the plaintiff must show is that he was treated adversely because of his race; i.e., that he was treated differently than other, similarly situated non-white officers. Thus, you may not find in favor of the plaintiff solely because you disagree with or disapprove of the way the plaintiff was treated by the defendants or find the defendant's actions to be unacceptable.

(Doc. 164 at p. 23; Tr. at 1365-66). Even after being given these instructions, the jury viewed the evidence presented and found that Defendants' justifications were mere pretext, finding Defendants liable for discrimination. Defendants have not presented a reason to overcome the substantial deference the Court must give to the jury's verdict.

### e. Municipal Liability

Defendants also challenge the jury's finding that the City is liable under 42 U.S.C. §§ 1981 and 1983. In order for the City to be held liable for discrimination under 42 U.S.C. §§ 1981 and 1983, a plaintiff must establish that the City's official policy or custom caused a constitutional

24

violation. *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658 (1978). A single decision of a policymaker can, in some circumstances, constitute an "official policy" for purposes of municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1985) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."). However, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 482. In addition, "'[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final' policy." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Based on the applicable law, the Court instructed the jury that, in order to find the City liable, the jury was required to find more than just that the City employed an individual who violated Plaintiff's rights. (Doc. 164 at 26; Tr. at 1369). The jury was instructed that Plaintiff must show the violation resulted from the City's official policy or custom, which could include (1) a policy statement or decision by a policymaking official, (2) the ratification by a policymaking official of a subordinate's discriminatory decision, or (3) a custom that is a widespread, well-settled practice that constitutes a standard operating procedure of the City. (Doc. 164 at 26-28; Tr. at 1368-70). Any one of these three theories would render the City liable, and the jury was not required to identify which theory on which it based its decision.[13] Significantly, the Court, to the benefit of Defendants,

---

[13] Neither party challenged the verdict form in this case or asked that the Court include jury interrogatories that asked on which theory of municipal liability the jury relied. Although Defendants proposed jury interrogatories as part of their proposed jury instructions, (Doc. 133), none of those proposed interrogatories addressed this particular question.

limited the relevant policymakers for purposes of the first two theories only to the Mayor and the Safety Director, expressly excluding the Chief of Police.[14]

As to a decision or ratification by a policymaker, Plaintiff does not point to any direct evidence showing that Mayor White or Mayor Campbell directly decided, or ratified a decision, to keep Lentz in gymnasium duty or to bring departmental charges. The majority of the evidence to which Plaintiff points relates to Director Draper. First, as to the departmental charges, it is clear that Draper personally issued and ratified the departmental charges brought against Lentz, including the amended departmental charges that were brought after the criminal charges against Lentz were no longer pending. Draper testified that any charges that could result in more than a three day suspension were required to come before the Safety Director rather than the Chief of Police (Tr. at 728), and the relevant collective bargaining agreement between the City and the CPPA gives the Safety Director exclusive authority to hear such charges. (Def. Ex. 53 at p.59). Indeed, Draper signed the amended departmental charges levied against Lentz. (Pl. Ex. 62). Defendants themselves argue that "the Director ultimately did not ratify all of the charges requested by Lt. Klimak, when he dismissed some of them." (Doc. 175 at 26). By negative implication, Draper <u>did</u> authorize or ratify the others, accordingly. Thus, as it relates to the amended departmental charges that had the effect of extending Lentz's gymnasium duty by two months, Director Draper himself ratified the charges. Indeed, Director Draper, whose testimony was particularly candid, conceded as much. Because of his final authority to do so, authorization or ratification of those charges constitutes a City policy for purposes of *Monell* liability.

---

[14] Plaintiff argues in its present brief that not including the Chief of Police as a policymaker was erroneous.

In addition, as mentioned in the previous section of this opinion, *supra* Part II.B.1.d, the jury also heard evidence that policymakers (the Safety Director and the Mayor) specifically discussed Lentz's case, and did so repeatedly. This evidence, although not direct evidence of a decision by a policymaker that violated Lentz's constitutional rights, demonstrates that the racial component of these police shootings, including Lentz's case, was on the minds of policymakers, and that policymakers discussed the investigations with those making the decisions regarding the investigations and gymnasium duty. As such, it is circumstantial evidence that could support a jury finding that there was either an unlawful decision, or ratification of an unlawful decision, by a policymaker. Given the standard the Court must apply in reviewing these post-verdict motions, and the extensive jury instructions on this issue, the Court cannot conclude that the jury's verdict on this issue should be upset.

Although the jury only was required to base its finding of municipal liability on one of three theories, Plaintiff also argues that there is evidence to support a finding that the City had a well-established practice of punishing white officers with gymnasium duty. Plaintiff points to the evidence that the five officers who received the longest periods of gymnasium time were white officers involved in the shootings of black suspects. (Tr. at 889-96). Plaintiff also points to the testimony of Officer James Simone and Officer Joseph Paskvan, both of whom are white officers who spent time in the gymnasium following shooting incidents.[15] (Tr. at 498; Tr. at 771-72). Officer Simone testified as to his involvement in ten shootings as a police officer, as well as his experience investigating "dozens" of shootings when he was assigned to a UDF investigation team. (Tr. at 484,

---

[15]  The Court here is referring to the testimony of these witnesses as to their personal experiences, not as to the improper general opinion testimony these witnesses attempted to offer.

27

487-88). Based on his personal experiences, Officer Simone testified that a white officer involved in a shooting, on average, spends more time in the gymnasium than a black officer involved in a shooting. (Tr. at 499-500). Officer Paskvan testified to his involvement in nine shootings as a police officer, including one in which he spent seventeen months in the gymnasium after a shooting that garnered media attention. (Tr. at 774-75). Finally, Plaintiff calls attention to the testimony of Robert Beck, the president of the CPPA, regarding his experience with the role that race and media coverage played in the City's investigation of police shootings. (Tr. at 737-41). Although this is not strong and undisputed evidence of a well-settled practice or standard operating procedure, the Court does not have to decide that, as a matter of law, such a practice or procedure existed. It only has to decide, viewing the evidence in a light most favorable to Plaintiff, and giving Plaintiff the benefit of all reasonable inferences, whether there is evidence upon which the jury could properly support a verdict in favor of Plaintiff. The Court decides that there is such sufficient evidence in this case.

Accordingly, for the reasons stated above, the Court concludes that it cannot upset the jury verdict as it pertains to Plaintiff's claim for discrimination, including the jury's decision that the City is liable for such discrimination.

### 2. Retaliation Claim

The *McDonnell Douglas* framework applied to Plaintiff's discrimination claim also applies to Plaintiff's retaliation claim. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his exercise of such protected activity was known by the defendant; (3) the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co.,*

28

*Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action").  As with the discrimination claim, once the plaintiff establishes a *prima facie* case for either a discrimination or retaliation claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *Abbott*, 348 F.3d at 542.  The plaintiff must then demonstrate that the proffered reason was a mere pretext for what was actually an improper motive.  *Id.*

In this case, the parties stipulated that Plaintiff satisfied the first element.[16]  Plaintiff filed a grievance on December 21, 2001 and an EEOC charge on July 17, 2002, both of which were based on his good faith belief that Defendants released his confidential medical records.  In addition, the jury heard testimony that, on January 23, 2003, Lentz asked his attorney, Patrick D'Angelo, to make a renewed demand to the City to resolve his EEOC charge.  (Tr. at 131-32).  Beyond this first element to which the parties stipulated, Defendants argue that Plaintiff did not establish that the relevant decisionmakers knew that Lentz engaged in protected activities, they object to the Court's instruction that the gymnasium duty and departmental charges constituted materially adverse actions, and they argue that Plaintiff did not establish a causal connection between the Plaintiff's protected activities and the adverse actions.  In addition, Defendants argue that Plaintiff failed to demonstrate that Defendants' legitimate, non-discriminatory reasons were pretext, and that Plaintiff failed to establish municipal liability under *Monell*.

---

[16]  Although Defendants acknowledge this stipulation, they complain about the extent to which Plaintiffs were permitted to refer to these protected activities.  The Court addresses this argument in the section of the opinion dealing with Defendants' complaints about the Court's evidentiary rulings.

29

### a.  Knowledge of Decisionmakers

Defendants argue that there is no evidence that any relevant decisionmaker knew that Plaintiff filed a grievance or an EEOC charge, except for Director Draper being told in passing that Plaintiff either had, or was going to, file an EEOC charge.  While there is not overwhelming evidence that satisfies this element, there are three key points.  First, Plaintiff's December 21, 2001 grievance has a stamp on it indicating that it was received by the "Chief's Office."  (Pl. Ex. 31).  In addition, that grievance was denied in a letter signed by Chief Mary Bounds.  (Pl. Ex. 32).  After seeing the denial letter, Chief Bounds testified that she must have been aware of the grievance at some time.  (Tr. at 445).  Second, Director Draper testified that the union president, Robert Beck, informed him that Lentz had or was going to file an EEOC charge.  (Tr. at 724) ("[I]n a meeting in my office it was the union president that let me know that [Lentz] had - - he was going to.  I don't know whether he had filed it, but he was thinking about filing it.").  Draper also testified that the EEOC charge was something that he was aware of before the final resolution of Lentz's departmental charges.  (Tr. at 725).  Thus, there is direct evidence that both the Chief of Police and Safety Director knew that Lentz had engaged in protected activity.

Finally, the jury could reasonably conclude from circumstantial evidence that the relevant decisionmakers were aware of the EEOC complaint and the January 2003 letter to the City discussing it.  Defendants contend that these documents were sent to the City law department, not the Safety Director or the Police Department, and that Chief Lohn and Lt. Klimak testified that they were not aware of them.  A reasonable jury, however, could disbelieve Chief Lohn and Lt. Klimak and rely instead on the affirmative evidence offered by Plaintiff.  For example, the evidence, discussed *supra* Part II.B.1.d, that Draper had a conversation with Lohn about pending investigations

30

of police shootings, including Lentz's case, and that Chief Lohn and Lt. Klimak also had brief conversations about the reinvestigation of Lentz's case.  Likewise, the jury heard evidence of the high-profile nature of the case, such that it could conclude that Lentz's name would not have been easily forgotten by the decisionmakers or that, given this background, it is unlikely that the City Law Department would not have discussed the charges by Lentz with the relevant officials.

Although there is not strong evidence to satisfy this element, the Court concludes that, based on the evidence presented, a reasonable jury could have concluded that the relevant decisionmakers were aware that Lentz engaged in a protected activity.

### b.    Materially Adverse Action

Defendants again argue that it was error for the Court to instruct the jury that the gymnasium duty and the departmental charges, in the circumstances of this case, constitute materially adverse actions.  For the reasons stated above in the discussion of Plaintiff's discrimination claim, the Court rejects that argument.  Indeed, with respect to a retaliation claim, the adverse actions do not need to be employment related, *Burlington N.*, 126 S.Ct. at 2415, arguably making this an easier decision in the context of this claim as it relates to the departmental charges.

Defendants also argue that, under this element, the adverse actions must occur after the decisionmakers became aware of the protected activity.  The Court will address this argument below in its discussion of the causal connection element, where it belongs.

### c.    Causal Connection

Next, Defendants argue that there was insufficient evidence from which the jury could conclude that there was a causal connection between Lentz's protective activity and the materially adverse actions.  "To establish a causal connection, a plaintiff must 'proffer evidence sufficient to

31

raise the inference that her protected activity was the likely reason for the adverse action.'" *Dixon*, 481 F.3d at 333 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997)). "Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dept. of Youth Servs*., 453 F.3d 724, 737 (6th Cir.2006). Consistent with that statement, "[t]he causal connection between the adverse employment action and the protected activity . . . may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

As an initial matter, the Court again reiterates that Defendants did not argue in their pre-verdict Rule 50(a) motion that there was insufficient evidence to support a finding of a causal connection. Defendants primarily argued that there was no evidence that any decisionmaker was aware that Lentz engaged in protected activity, a separate element. To the extent that their failure to challenge the evidence regarding a causal connection bars them from now raising that issue under Rule 50, the Court could reject that argument solely on that basis. For the reasons stated below, however, the Court finds that there was sufficient evidence from which a reasonable jury could conclude that there was a causal connection between the protected activity and the adverse employment actions.

In this case, the jury heard the following evidence. Plaintiff filed a grievance with the Police Department on December 21, 2001. In April 2002, Plaintiff's case was taken back from the grand jury to be reinvestigated, even though the original investigator and original prosecutor believed it was complete and ready to be submitted to the grand jury. Lt. Klimak testified that this was the first

32

time he had taken a case back after it had been submitted to the grand jury.  (Tr. at 605).  Plaintiff

filed an EEOC charge on July 17, 2002.  On January 23, 2003, Lentz asked his attorney, Patrick

D'Angelo, to make a renewed demand to the City to resolve his EEOC charge.[17]  (Tr. at 131-32).

On February 5, 2003, criminal charges were filed against Lentz, followed by a request for

departmental charges from Lt. Klimak.  The remaining criminal charge against Lentz was dismissed

on July 27, 2003.  That same day, Lt. Klimak requested amended departmental charges against

Lentz, including a new charge that previously had not been raised, a charge for failure to notify.

Those amended charges were officially lodged against Lentz a few weeks later.

Regarding temporal proximity, most striking is the fact that the departmental charges issued

only about two weeks after Plaintiff's attorney sent a demand to the City to renew the EEOC charge.

Although Defendants maintain that departmental charges always result automatically from criminal

charges, the evidence was not as clear on this point as Defendants suggest, *see supra* Part II.B.1.d.

The amended departmental charges were brought, moreover, as soon as Lentz was <u>cleared</u> of all

criminal charges brought against him.

While temporal proximity alone is insufficient to establish a causal connection, a plaintiff

may demonstrate a causal connection by showing temporal proximity "and by showing that he was

treated differently from other employees."  *Moore*, 171 F.3d at 1080.  The lengthy discussion above,

*supra* Part II.B.1.c, indicates the ways in which the evidence showed that Lentz was treated

differently than other employees.  The unique treatment Lentz received could be considered as

indicia of retaliation, at least when viewing the light in an evidence most favorable to Lentz, which

---

[17]  Lentz also testified that he received a copy of the letter, though the letter was not used
as an exhibit in this case.

33

the Court must do at this stage of the proceedings.[18]

While it is possible that, on this particular claim, the Court "may have reached a different conclusion sitting as the finder-of-fact, it is not [the Court's] place to substitute [its] judgment for that of the jury." *Barnes v. City of Cincinnati*, 401 F.3d 729, 738 (6th Cir. 2005).  The jury was clearly instructed as to what it needed to find in order to conclude that plaintiff had established a causal connection between his protected activity and any adverse actions against him, including that timing alone is not sufficient.  The Court instructed that:

> A causal connection may be shown in many ways.  For example, one factor you may consider, among others, is whether there is sufficient connection through timing, that is the defendant's action followed shortly after the defendant became aware that plaintiff filed a grievance or filed an EEOC charge.  Causation is, however, not determined by timing alone nor is it ruled out by a more extended passage of time. Causation also may or may not be proven by antagonism shown toward the plaintiff or a change in the demeanor toward the plaintiff.

(Doc. 164 at p. 31; Tr. at 1373).[19]  Given the deference this Court owes to the jury verdict, the Court is not willing to upset the verdict based on this issue.

### d.    Pretext

Defendants also argue that Plaintiff did not establish that their legitimate, non-discriminatory reasons for their actions were mere pretext.  As with Plaintiff's discrimination claim, the same burden-shifting analysis applies.  The Court does not repeat the legal framework here.  In addition, much of the same analysis regarding the discrimination claim applies here.  For the same reasons

---

[18]  As noted above, moreover, the evidence at trial indicated that the "failure to notify" with which Lentz was charged may have arisen from the City's own faulty radio system.  Surely the jury was free to conclude that levying charges in those circumstances - after Lentz had been cleared of all others brought against him - was not prompted by the blind following of customary departmental policy.

[19]  Defendants did not object to this instruction.  (Tr. at 1277).

34

stated in that section, a reasonable jury could reject the justifications for Lt. Klimak reinvestigating Lentz's case, the filing of the departmental charges, and the filing of amended departmental charges. The primary difference in the analysis as it relates to the retaliation claim is that the jury must also have found not only that the proffered explanations are false, but that <u>retaliation</u> (as opposed to discrimination) was the real reason Defendants took adverse actions against Plaintiff.

Although the evidence on this issue certainly is not as strong as it is with respect to the discrimination claim, there is one crucial point: the jury heard significant evidence that this was a high-profile case about which the decisionmakers, Mayor Campbell, Director Draper, Chief Lohn, and Lt. Klimak had at least some discussions. Viewing the evidence in a light most favorable to Plaintiff, as the Court must, and keeping in mind once more the jury's right to make all relevant credibility determinations, a jury could conclude that the relevant decisionmakers were aware of, and were motivated by, Plaintiff's protected activity when taking the adverse actions against Plaintiff. Again, the Court is not to put itself in the position of the trier of fact. That is the jury's role, and the jury was given specific instructions as to how to fulfill that role. (Doc. 164 at p. 32) ("In order to prove that defendants City of Cleveland's alleged explanation is a pretext for impermissible retaliation, plaintiff Edward Lentz must show both that the explanation is false <u>and</u> that retaliation was the real reason the defendant took the adverse action.") (emphasis in original). The jury heard all the evidence, received clear instructions, and found that Defendants unlawfully retaliated against Lentz. Again, that the Court might have reached a different conclusion is not a compelling reason to upset the jury's verdict. Accordingly, the Court does not find that there is insufficient evidence of pretext such that a reasonable jury would have to find in favor of Defendants.

### e. Municipal Liability

35

As with Plaintiff's discrimination claim, the jury was instructed that, in order to find the City liable under 42 U.S.C. §§ 1981 and 1983 for the alleged retaliation, Plaintiff must show the violation resulted from any one of the following:  (1) a policy statement or decision by a policymaking official; (2) the ratification by a policymaking official of a subordinate's discriminatory decision; or (3) a custom that is a widespread, well-settled practice that constitutes a standard operating procedure of the City.  (Doc. 164 at p. 33; Tr. at 1376).  Like the discrimination claim, the jury was instructed that the Mayor and the Safety Director (but not the Chief of Police) had policymaking authority.  (*Id.*)

The jury concluded that municipal liability existed in this case, though it was not required to indicate on which of the above theories it based its decision.  Based on the evidence presented, there are two potential theories the jury could have used to reach its decision.  First, as with Plaintiff's discrimination claim, the evidence showed that Director Draper personally ratified the departmental charges and amended departmental charges brought against Lentz.  As such, his decision or ratification constitutes City policy for purposes of *Monell* liability.  Second, there is sufficient circumstantial evidence, discussed above, *supra* Part II.B.2.a, that policymakers and decisionmakers discussed Lentz's case such that a jury could infer that there had been ratification of a decision to unlawfully retaliate against Lentz.  Given the existence of such evidence, the Court must defer to the jury's verdict.

Accordingly, for the reasons stated above, the Court finds that there is sufficient evidence to support the jury's finding that Defendants are liable for Plaintiff's claim of retaliation, including the

36

jury's finding of municipal liability.[20]

### 3.    Evidentiary Rulings

Next, Defendants challenge the Court's rulings with respect to certain of their motions in limine. In addition, Defendants argue that Plaintiff impermissibly went beyond some of the Court's limiting instructions in some situations. They argue that these errors and violations improperly affected the presentation of the evidence. Although never expressly stated, presumably Defendants believe that these evidentiary errors warrant judgment in their favor or a new trial.

The standard to review Defendants' arguments is set forth in Fed. R. Civ. P. 61:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

---

[20]  Even if the Court found that there was insufficient evidence for the jury's finding as to retaliation, upsetting the jury's verdict on that one claim likely would not reduce the judgment award. Plaintiff alleges the same adverse actions and same injury for each claim: the extended gymnasium duty and accompanying negative effects, both financially and emotionally. The jury was not asked to divide its award by claim, and, although Defendants proposed jury interrogatories to that effect, they did not object to their absence in the verdict form. Indeed, allowing the jury the possibility of awarding damages for each claim likely would run afoul of the rule against double recovery, as each claim alleges the same injury. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 581 (6th Cir. 1994) ("If two claims arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery . . . . (quoting *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223 (10th Cir. 1988), *implied overruling on other grounds recognized by Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996)). The jury was even instructed to that effect. (Doc. 164 at p. 37) ("[E]ven if you determine the plaintiff has proven both of his claims, you can only award damages for the plaintiff that the plaintiff has actually suffered. You cannot award 'double damages' merely because the plaintiff has proven both of his claims.").

The Court addresses each of Defendants' arguments in turn.

### a.  Witnesses

Defendants argue that the Court erred in permitting Officer Joseph Paskvan, Officer James Simone, attorney Patrick D'Angelo, and union president Robert Beck to testify in this matter. Defendants' arguments, however, read like a summary of the Court's evidentiary ruling rather than an argument as to why the ruling was prejudicial or "inconsistent with substantial justice." Indeed, Defendants do not even attempt to argue how the testimony of these witnesses affected the jury's determination.

First, the Court notes that, although the Court ruled that D'Angelo could testify, he was not called during trial.  Defendants, therefore, cannot argue that any prejudice flowed from the Court's ruling, even if erroneous.  As to Officer Paskvan, Defendants argue that Paskvan's testimony is irrelevant because he is not similarly situated to Plaintiff.  As is clear from the record, the Court carefully limited the scope of Paskvan's testimony to remove any potential prejudice to Defendants, but permitted him to testify as to some of his personal experiences as it relates to his own gymnasium duty following a shooting incident.  (Tr. at 5).  Given Defendants repeated contention that imposing gymnasium duty on an officer was akin to doing that officer a favor, testimony from officers who actually experienced such assignments was certainly relevant.  Paskvan's testimony during trial conformed to the Court's limitations on it.  For these reasons, and the reasons explained by the Court in ruling on Defendants motion in limine, (tr. at 4-8), the Court finds no prejudice in permitting Paskvan to testify in this matter.

As to Officer Simone, Defendants argue that Simone testified about his general opinions rather than his personal experiences despite not being identified as an expert.  Defendants admit,

38

however, that the Court carefully circumscribed the scope of Simone's testimony when it permitted him to testify, (Transcript from 1/11/07 Final Pretrial ("Final Pretrial Tr.") at 60-61), and it further limited his testimony during trial, sustaining Defendants' objections to certain questions and reminding both Simone and Plaintiff's counsel about the permissible parameters of Simone's testimony, (Tr. at 483-91). Given the careful limiting of Simone's testimony, the Court sees no substantial injustice that flowed from permitting him to testify.

As to Beck, Defendants also argue that he was permitted to present generalized "opinion" testimony. Again, however, the Court limited Beck to testifying as a fact witness regarding his personal experiences. During trial, the Court reigned in Beck's testimony when he began to stray from these limitations by sustaining Defendants' objections and reminding the witness about the permissible scope of his testimony. (Tr. at 752) (COURT: "Mr. Beck, only testify to facts. Not to your feelings."). Again, given these limitations, there is no prejudice that resulted from Beck's testimony.

### b.    News Stories

Defendants moved in limine to prevent Plaintiff from presenting as evidence certain newspaper articles and television news clips to the jury. The news stories pertained to the media attention and public outcry surrounding police shootings in the City of Cleveland in late 2001 and 2002. Some, but not all, specifically referred to Lentz's case. Defendants argued that the news stories were hearsay, irrelevant, and prejudicial. The Court denied Defendants' motion, finding that they were not being offered for the truth of the matter they asserted, and that they were relevant to show public concern and media attention surrounding the shooting incident as well as to support Plaintiff's contention that all relevant policymakers were aware of, and concerned about, everything

39

related to that incident, including any punishment meted out to Lentz.  (Tr. at 2-3).  The Court, however, noted it would restrict the manner in which they were used to diminish any potential prejudice to Defendants.  (*Id.*)  At trial, the Court restricted Plaintiff to showing <u>only one</u> of the fifty television news clips to the jury, and allowed Plaintiff only to summarize the rest in one brief document.  (Tr. at 1056-57).  Only the single news clip and the document summarizing the stories was admitted into evidence and given to the jury during deliberations.  When the jury requested the additional news clips, the Court did not grant the request.  Despite these limitations, Defendants complain that the Court erred in its rulings.

The only <u>argument</u> Defendants present (as separate from the rest of its brief on this point, which is only a summary of the Court's rulings and presentation of evidence) is that, based on the jury's request to see all the newscasts, it is "highly probable" the jury wanted to see the clips for the truth of the matter they assert.  There is no reason to accept Defendants' speculation.  It is equally likely that they wanted to better determine the extent of media coverage and public outcry.  In any event, they were not given the rest of the news clips.  Even if they accepted the one clip they did view for the truth of the matter asserted, Defendants do not explain how that is so prejudicial as to require a new trial.[21]  For those reasons, and the reasons stated by the Court when it denied Defendants' motion in limine, the Court must reject Defendants' argument on this issue.

### c.    EEOC Charge

Defendants moved in limine to prevent Plaintiff from referring to the City's alleged release of his medical records.  It was this alleged release that caused Lentz to file a grievance and an EEOC

---

[21]  Indeed, much of the substance of the news clip, if believed, was actually unflattering to Plaintiff.

charge, which are the protected activities to which the parties stipulated for purposes of Lentz's retaliation claim. The Court denied the motion limine, but strictly limited Plaintiff's ability to refer to the alleged release of the medical records. (Final Pretrial Tr. at 22). In addition, the Court gave the jury a thorough and clear limiting instruction during trial when Lentz testified in relation to his EEOC charge. (Tr. at 110-11). Given the limitations the Court applied to this evidence, and the careful instruction it gave to the jury, the Court does not find that reference to the EEOC charge was so prejudicial as to require a new trial, or that it was prejudicial at all for that matter.

Defendants' other primary complaint with respect to the EEOC charge is Plaintiff's reference to certain letters containing settlement requests. One is a November 2002 letter sent to the EEOC from Patrick D'Angelo, the attorney representing Lentz in connection with his EEOC charge. (Pl. Ex. 45). The other is a letter sent from D'Angelo directly to the City on January 23, 2003, a letter that was not included by Plaintiff in his trial exhibits. Defendants claim that reference to these letters went beyond the Court's limiting instruction with respect to the EEOC charge, and that they were prejudiced because Plaintiff indicated that the January 23, 2003 letter was actually received by the City, when the letter itself was not in evidence and there was nothing to indicate to whom the letter was addressed.

First, the Court notes that Defendants' argument regarding these letters does not actually relate to the prejudice that flowed from permitting reference to the EEOC charge; rather it relates to the sufficiency of the evidence for Lentz's retaliation claim. Specifically, Defendants argue that no relevant decisionmaker was aware of Lentz's protected activity, and that these letters should not be used as evidence of knowledge. Indeed, there is no substantive information in the November 2002 letter, the only letter the jury viewed, that adds more information about the EEOC charge than the

41

jury already knew.  The jury was instructed that Lentz had a good faith belief that the City released

his medical records, but that, later, it was determined that there was no evidence that the City did so.

(Tr. at 110).  The settlement demand is consistent with Lentz's good faith belief that the City had

violated his rights.

As to the City's argument that these letters should not be used to show that the relevant

officials were aware of Lentz's protected activity, that argument is without merit.  The jury was free

to infer that other City officials, outside of the City's law department, were aware of a formal letter

sent by Lentz's attorney to the City.  Likewise, Defendants were free to cross-examine Lentz about

the letters and present evidence to the jury that the relevant decisionmakers assert they were not

aware of them.  Simply because Defendants would like the jury to accept their arguments does not

mean that evidence that points to a different conclusion is improper.  The Court, therefore, does not

find that there was any error allowing evidence of these letters.[22]

### d.  Grand Jury

Defendants filed a motion in limine to prevent Plaintiff from referring to the grand jury

proceedings in which the grand jury returned an indictment on the misdemeanor falsification charge

against Lentz, but not on the felonious assault charge.  Defendants sought to exclude reference to

those proceedings as well as to the prosecutor's thought process.  Defendants complain that the jury

---

[22] Defendants also made passing reference in their motion in limine, as well as in their present motion, that these letters constitute conciliation efforts by the EEOC that may not be used in a "subsequent proceeding."  *See* 42 U.S.C. § 2000e-5(b).  These letters, however, were from Lentz's attorney to the EEOC and from Lentz's attorney directly to the City.  The plain language of the statute that Defendants' cite pertains only to conciliation efforts by the EEOC, not to settlement demands by a private party.  Notably, Defendants did not argue in their motion in limine, or now, that these demands should be excluded pursuant to any Federal Rule of Evidence.

42

in this case might have believed that, because the grand jury did not return an indictment on the felonious assault charge, Prosecutor Watson had no probable cause to bring the charge in the first instance.

The Court denied Defendants' motion, reasoning that Plaintiff did not seek to introduce the actual substance and details of the grand jury proceedings, but merely the result of those proceedings - i.e., the fact that the grand jury decided not to indict on the felonious assault charge. As the Court indicated when it denied Defendants' motion, Defendants were free to tell the jury that a failure to return an indictment does not necessarily mean that there was no good faith basis to submit the charge to the grand jury in the first instance. (Final Pretrial Tr. at 50-51). Indeed, Defendants elicited testimony from Prosecutor Watson that the grand jury's decision not to indict on the felonious assault charge is not a repudiation of Watson's decision to charge Lentz, but a common occurrence in the grand jury system. (Tr. at 1158-59). Thus, although the Court does not find that permitting limited reference to the grand jury proceedings was erroneous, even if it was erroneous, Defendants cannot claim any prejudice. Having taken advantage of the opportunity to explain their position to the jury, Defendants removed any potential prejudice.

In addition, evidence of the result of the grand jury proceedings is relevant to the decision by Director Draper to ratify amended departmental charges after the grand jury's decision. In other words, even though the most serious criminal charge against Lentz had been no-billed by the grand jury (and after the lesser misdemeanor offense had been dismissed), Lt. Klimak requested, and Director Draper ratified, amended departmental charges against Lentz, despite being aware of the grand jury's decision. The result of the grand jury proceeding, therefore, speaks directly to Defendants' position that departmental charges cannot be evidence of discriminatory or retaliatory

43

intent because departmental charges "automatically" flow after criminal charges are filed. The fact that the departmental charges did not mirror the criminal charges, and were not "automatically" withdrawn after the grand jury refused to indict on at least some of the matters upon which the departmental charges were allegedly premised is highly relevant to this point.

### e. Dr. Steinberg

Defendants reiterate their objection to the Court's decision to allow Dr. Joel Steinberg to testify about the emotional and psychological harm that he believes Lentz has suffered as a result of the City's actions. They do nothing more, however, than cite to the reasons in their motion in limine to exclude Dr. Steinberg that the Court has already rejected. Most of the City's arguments in its motion were general attacks on Steinberg's conclusions rather than his methodology, and they are clearly matters that go to weight and credibility, rather than admissibility, of his evidence. Defendants had ample opportunity to cross-examine Dr. Steinberg regarding the issues they raised in their motion, and they covered many of those issues. Accordingly, for those reasons, and for the reasons stated by the Court when it denied Defendants' motion in limine, this argument must again be rejected.

### f. Similarly Situated Employees

Defendants argue that the Court erred in permitting evidence of the seven comparable African-American officers who Plaintiff argued were similarly situated but treated more favorably. Defendants first contend that these officers were not properly disclosed, and were not similarly situated as a matter of law and should not have been presented to the jury. For the reasons stated by the Court when it denied Defendants' motion, these officers were sufficiently disclosed to be permissible witnesses. (Final Pretrial Tr. at 51-52). Also, for the reasons stated above, *supra* Part

44

II.B.1.c, the Court rejects Defendants' argument that these officers were not similarly situated as a matter of law.

Defendants also argue that the jury could have assumed that these officers were, in fact, similarly situated because they were permitted to testify and/or the jury was permitted to see their UDF files. According to Defendants, that risk is especially acute because there was not a separate jury instruction as to what makes one similarly situated. First, the jury was instructed that Lentz must show that "he was treated differently than other, similarly situated non-white officers." (Doc. 164 at p. 23; Tr. at 1365). Defendants did not object to this instruction at the attorney charge conference, nor did they request a separate instruction on the "similarly situated" element. Indeed, even Defendants' own proposed instructions did not contain a separate instruction on this element. (*See* Doc. 133). Defendants cannot now assert that the Court erred in not providing one. Moreover, Defendants' contention that the jury might have *assumed*, apparently without deciding, that these officers were similarly situated is mere speculation; there is no reason to believe that assertion. Accordingly, Defendants' argument on this issue must be rejected.

### g.    Criminal Charges

Defendants moved in limine to exclude reference to the filing of criminal charges as an adverse employment action. The Court granted Defendants motion in part, in that it excluded reference to the criminal charges as an adverse employment action for purposes of opening statements, and reserved the question of how the jury would be charged on that issue until it heard all the evidence. (Final Pretrial Tr. at 46-47). In addition, the Court ruled that those charges could be referred to during trial because, according to Defendants, they were so closely tied to the departmental charges, they required discussion to put the reasons for the departmental charges in

45

context.  (*Id.* at 47).  Ultimately then, the Court concluded that the jury could <u>not</u> consider the filing of criminal charges as an adverse employment action, and instructed the jury only that the gymnasium duty and the departmental charges constituted the adverse employment actions.

Despite receiving a mostly favorable ruling on their earlier motion, Defendants now complain that the reference to criminal charges during the course of the trial might have misled the jury into believing that those charges were a part of the action for which the City was liable.  Aside from the fact the jury was specifically instructed that only the gymnasium duty and the departmental charges constituted the adverse employment actions in this case, Defendants necessarily had to reference the criminal charges as a key component of <u>their</u> defense.  Defendants argued throughout trial that departmental charges flow automatically from criminal charges.  Presumably, Defendants would have preferred the Court to rule that only Defendants can refer to the criminal charges to absolve their conduct, but not permit Plaintiff to question that conduct.  The Court's failure to take that unreasonable course of action can hardly be a basis for a new trial.  Accordingly, the Court rejects Defendants' argument on this issue.

### 4.    Conclusion and Overview of Sufficiency of the Evidence

This case is one which highlights the importance of letting certain matters go to trial and play out in front of a jury.  Defendants' written descriptions of the events at issue, both pretrial and now post-trial, paint a very different picture than that actually developed through the evidence presented at trial.  Indeed, based on the parties' written pretrial submissions, this Court had its doubts about Plaintiff's ability to establish certain critical elements of certain of his claims.  Thus, while the Court felt that genuine issues of fact prevented judgment in Defendants' favor as a matter of law, the Court went into the trial believing Defendants might ultimately prevail in the jury battle over those material

46

issues.

Despite receiving numerous favorable evidentiary rulings from this Court, and similarly favorable cautionary instructions to the jury, however, the trial simply did not unfold as Defendants had hoped.  Safety Director Draper was quite candid in his description of the level of concern caused by and, thus, given to, the Lentz shooting.  These descriptions were confirmed by substantial circumstantial evidence from which the jury could infer that virtually nothing about these events, and particularly the officer involved therein, went unnoticed by the City's relevant decision-makers.  Against this backdrop are both the fact that the job of ferreting out intent and motive are quintessentially questions for the jury, and that those questions largely turn on credibility determinations, which the jury must be left free to make as it sees fit.

The evidence in this case[23] can be fairly interpreted in more than one way, and the credibility of at least certain of Defendants' witnesses was open to fair attack.[24]  That the jury may have doubted

---

[23]  Interestingly, Defendants vigorously sought, and continue to seek, exclusion of virtually all evidence which might undercut their own explanations for their actions with respect to Officer Lentz.  Again, while improper evidence should certainly be excluded from a jury's consideration, evidence is not rendered improper merely because it is inconsistent with the defendants' theory of the case.

[24]  One key witness, Lt. Klimak, warrants specific discussion.  Although the cold record will not bear out his demeanor on the stand, even the cold record shows the absurdity of some of his testimony when contrasted with the other testimony the jury heard.  For example, the jury heard testimony from several officers - not just Lentz - that the police gymnasium was dirty and cold, that one officer wore a prison uniform to report to the gymnasium to express his feelings about it, and that officers would not want to spend one year there, much less two years.  In contrast, Lt. Klimak testified that the gymnasium is "not an unpleasant experience," that gymnasium time is time spent "getting to be buff" for which people "spend big money," and that "You could have put me there for two years and I wouldn't have complained."  (Tr. at 600-01).  Such testimony, in the face of contradictory statements from so many witnesses, combined with his overall demeanor, could lead a reasonable jury to conclude that his testimony was unreliable.

47

Defendants' explanations for their actions, or have interpreted the evidence differently than Defendants asked them to, does not render the verdict suspect.

This is why we have juries and why, barring extreme circumstances, we must give deference to the decisions they make. For the reasons stated and those reflected in the Court's rulings at trial, Defendants' motions for judgment as a matter of law, or, alternatively, for a new trial, must be denied.

## III.    MOTION TO AMEND THE JUDGMENT (REMITTITUR)

In the alternative, Defendants also request that the Court reduce the present judgment because it is not supported by the evidence. For the reasons briefly stated below, Defendants' alternative motion must be denied.

### A.    Legal Standard

As a general rule, the Sixth Circuit has held that "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990). A trial court is within its discretion in remitting a verdict "only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Id.* "If there is any credible evidence to support a verdict, it should not be set aside." *Id.*

### B.    Discussion

After finding Defendants liable for both discrimination and retaliation, the jury concluded

48

that Lentz should be awarded $800,000 to compensate him for his injuries.  (Verdict, Doc. 166 at p. 5).  The jury was not required to assign specific amounts to specific injuries - e.g., a specific amount for lost economic opportunities or for emotional distress.  Neither party objected to the absence of interrogatories requesting that the jury parse out its award, and Defendants do not challenge the absence of those interrogatories now.  Indeed, by failing to object formally on the record at the jury charge conference, Defendants have waived their right to raise such a challenge at this point.  *See* Fed. R. Civ. P. 51(c); *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) ("Under Rule 51, Fed.R.Civ.P., failure to object waives the right to appeal from an incorrect instruction."); *see also Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 548 (6th Cir. 1995) ("Even though defendants' principal quarrel is with the interrogatories rather than the charge itself, their obligation to formally object and state their position was not lessened.").[25]

Defendants now ask the Court to amend the judgment award in this case on the basis that it is not supported by the evidence presented at trial.  They do not, however, suggest an alternative amount.  In support of their argument, Defendants argue that some of Lentz's claimed economic losses are not supported by the evidence, his emotional distress does not amount to $800,000 in damages, the award constitutes improper punitive damages, and Lentz failed to mitigate his damages by requesting to be released from the gymnasium or seeking secondary employment.

---

[25] As indicated above, *supra* n.17, Defendants did propose interrogatories requesting a parsed out award with their proposed jury instructions.  However, Defendants did not object to the absence of these interrogatories in the verdict form.  Although Defendants do not attempt to make this argument, the Court notes that merely offering an instruction clearly does not preserve a later objection to different instructions.  *See Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) (rejecting argument that a party "implicitly objected by offering a different instruction"); *see also Woodbridge v. Dahlberg*, 954 F.2d 1231, 1237 (6th Cir. 1992) (*"The law in this circuit generally requires a formal objection"*).

As an initial matter, the Court notes that most of Defendants' arguments are misplaced. Having not objected to the absence of interrogatories requiring the jury to parse out its award, Defendants are left without firm ground to argue that any particular basis for the jury's award is without support.  For example, Defendants argue that about $11,000 of the $40,000 of Lentz's claimed lost economic damages were, in fact, returned to Lentz as unpaid overtime when he was reinstated.  As such, Defendants contend that Lentz was not entitled to that particular portion of his claimed economic losses.  Without knowing how much of the award was tied to lost economic damages (as opposed to emotional distress), it is entirely possible that the jury accepted Defendants' argument and still awarded the remainder of the $800,000 to compensate Plaintiff for his emotional distress.  As the verdict form reads, there was no way for the Court to determine that calculation and, therefore, no basis to grant the relief Defendants request.

Similarly, perhaps the jury, at Defendants' urging, did not believe that Lentz was prevented from seeking, or actually would have sought, secondary employment as a mason, such that he cannot claim $52,000 in lost secondary employment opportunities.  It is possible that the jury could have accepted that argument but still awarded $800,000 to Lentz for emotional distress.  The verdict form, on its face, simply does not lend itself to such attacks.

Likewise, Defendants also have no basis to contend that, in determining the amount to be awarded for emotional damages, the jury improperly considered certain "stressors" that are not legally attributable to the City.  Despite admitting that "[t]he Court was very clear in that the only grounds for which the City could be potentially liable were the gymnasium stay and departmental charges," (Doc. 175 at p. 52), Defendants argue that the jury improperly awarded Lentz damages on account of actions for which the City could not be liable, such as the filing of criminal charges

50

or the release of medical records. Defendants, however, had every opportunity to point out to the jury that Plaintiff's expert, Dr. Steinberg, should discount these actions in determining the emotional injury Plaintiff suffered as a result of the City's actions. Indeed, Defendants made that point both on cross-examination of Dr. Steinberg and in closing argument. (Tr. at 362-63, 1331).

In any event, because we are left with an award of a single figure, not attributed to specific injuries, Defendants have no basis to contend that the jury improperly considered one factor or another. It is equally possible that the jury considered Defendants' arguments and "remitted" its own verdict - i.e., that it decided that the total emotional distress Lentz suffered should be compensated in the amount of $3.5 million, for example, but the portion attributable to actionable wrongs only amounts $720,000 or $770,000, or whatever amount it concluded. In short, because Defendants failed to request interrogatories that would itemize the jury's damage award, it is left without any basis to challenge specific evidence that the jury did or did not consider. It has, moreover, waived even the ability to argue that the Court erred in not including such interrogatories.

One final point is worth noting. Defendants argue that the jury award constituted improper punitive damages. Aside from arguing that Plaintiff's counsel may have urged an award that is punitive in nature in closing argument, Defendants provide no support for their argument. The Court clearly instructed the jury on damages, noting in two separate places that any damage award "must compensate him only for the damages he suffered, no more and no less," and that damages "must be fair compensation, no more and no less." (Doc. 164 at pp. 37, 38; Tr. at 1378, 1379). The Court has no reason to believe that the jury did not understand or follow those instructions.

Accordingly, for the reasons stated above, the Court must deny Defendants' motion pursuant to amend the judgment.

## IV.    MOTION FOR PREJUDGMENT AND POST-JUDGMENT INTEREST

Finally, Plaintiff moves for prejudgment and post-judgment interest on the jury award of $800,000.  For the reasons stated below, the Court denies Plaintiff's request for prejudgment interest and grants his request for post-judgment interest.

### A.    Prejudgment Interest

A post-judgment motion for prejudgment interest should be treated as a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e).  *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989).[26]  In the Sixth Circuit, "the award of prejudgment interest is within the discretion of the trial court."  *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170 (6th Cir. 1996) (citing *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984)).  "Prejudgment interest helps to make victims of discrimination whole and compensates them for the true cost of money damages they incurred."  *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994) (citing *West Virginia v. United States*, 479 U.S. 305, 310 (1987)).  Prejudgment interest is commonly awarded to back pay awards.  *Thurman*, 90 F.3d at 1170 (citing *Wooster Brush*, 727 F.2d at 579).

In this case, the Court declines to award prejudgment interest to Plaintiff.  Although there is support for the proposition that prejudgment interest should apply to all past injuries, including emotional injuries, *see Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002), the somewhat unique nature of Plaintiff's emotional injuries renders such an award inappropriate in this case.  Plaintiff's claim of emotional harm was premised on an adjustment

---

[26]  There is no dispute that Plaintiff's motion was within the ten-day time limit imposed by Rule 59(e).

disorder with anxiety and depressed mood which, by definition, was temporary and dissipated once the causes of the disorder (gymnasium duty, among others) were no longer present.  According to Plaintiff's expert, the disorder ceased prior to the filing of this lawsuit.  These emotional injuries, therefore, were not injuries that Plaintiff suffered throughout the pendency of this lawsuit.  In addition, the nature of the emotional harm (which is caused by a cumulation of stressors) does not lend itself to a precise start date or "date of injury" from which the Court could find that interest began to run.  For that matter, there is also no precise end date when the disorder subsided.  For his part, Plaintiff has not attempted to define any specific dates to guide the Court.  The Court, therefore, is unable to calculate a prejudgment interest award with any certainty and must deny Plaintiff's request for such an award.

In addition, because the award was given in one amount to compensate Plaintiff for all of his injuries, both economic and emotional, the Court also cannot award prejudgment interest on only the economic injuries Plaintiff alleged (e.g., lost court time, no lunch time).  It is simply not possible to parse out the award that way.  Just as the general nature of the verdict form worked to the detriment of Defendants in their attempt to remit the award, it works to the detriment of Plaintiff in his request for prejudgment interest.

For these reasons, the Court concludes that Plaintiff is not entitled to pre-judgment interest.

**B.      Post-Judgment Interest**

Unlike prejudgment interest, the award of post-judgment interest is not discretionary.  Under 28 U.S.C. § 1961, "[i]nterest <u>shall</u> be allowed on any money judgment in a civil case recovered in a district court."  (Emphasis added).  Under this statute, interest runs from the date of the entry of judgment by the court rather than from the date of the jury verdict.  *Scotts Co. v. Central Garden &*

*Pet Co.*, 403 F.3d 781, 792 (6th Cir. 2005) (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990)). In this case, the Court entered judgment on January 30, 2007. (Doc. 167). Accordingly, Plaintiff is entitled to post-judgment interest on the jury award of $800,000 at the statutory rate of interest, computed daily from January 30, 2007 to the date of payment.

## V.  CONCLUSION

For the reasons stated above, *Defendants' Rule 50 Motion for Judgment Notwithstanding the Verdict and Alternative Motions* (Doc. 175) is **DENIED**, and *Plaintiff's Motion for Prejudgment and Post-Judgment Interest* (Doc. 174) is **GRANTED in part** and **DENIED in part**. Plaintiff is entitled to post-judgment interest on the judgment but not prejudgment interest.

In addition, the Court **TERMS** *Plaintiff's Motion for Attorney Fees and Costs* (Doc. 184) subject to reassertion after either Defendants' time to file a notice of appeal passes or, if an appeal is taken, after resolution of the appeal, whichever occurs sooner.

IT IS SO ORDERED.

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 21, 2007**

54